Folger, J.
The board of public officers in New York city known as the commissioners of public charities and correction, was created by the act of 1860, chapter 510. (Laws of 1860, p. 1026, § 1.) By that act, the alms-house department of the city and county of New York and the office of governor of the alms-house was abolished (Id., § 3.) The board by the act created was empowered and directed to possess and exercise full and exclusive powers for the management, etc., of the several institutions which had been under the control of the board of governors of the alms-house, and especially of the nurseries for poor and destitute children (Id., § 4.) And the board by the act created were thereby possessed of every power and authority at that time conferred upon the former alms-house commissioners, the board of ten governors, or the individual governors of the alms-house by any law of the State, which power might affect or relate to the institutions above referred to or their inmates. (See. 5.) The power was given to the board, or any member of it, to indenture and bind out, as apprentices, any minor children who might be under its care by reason of the provisions of the act, or of any other act of the State. (Sec. 18.)
The alms-house commissioners in that act mentioned are mentioned in an act passed April 9, 1813 (2 R. L., pp. 342-439, § 246), and they were thereby to be the overseers of the poor of the city of New York, and to have the same power of overseeing and providing for the poor of that city which the overseers of the towns had therein, and they or any two of them had the same power and authority as overseers of the poor of towns for putting and binding out apprentices and servants in the said city; and any one or two or more of them had the same power and authority to do every act and thing in pursuance of the “ act for the settlement and relief of the poor ” and the “ act concerning apprentices and servants,” in the same manner as if they were justices of the peace of the city and county of New York or the aider-men of said city. (Id., § 258.)
. The overseers of the poor of the towns of the State, by *389 the “ act concerning apprentices and servants ” (passed 20th February, 1801, 1 R. L., p. 135), had power by and with the consent of the justices of the peace, or any two of them, to bind out any child who should be chargeable to the town, to be apprentices or servants according to their degree or ability, where they should see convenient. (Id., § 4.)
Thus it appears that the commissioners of charities and correction have the power to bind out to be an apprentice any child who is chargeable to the city.
The Revised Statutes have not materially changed the powers of overseers of towns in this matter (2 R. S., 155, § 6), nor limited their power in a case in which the child or the parent of the child has become chargeable to the town. And though the overseers of the poor of a town could not bind out a child as an apprentice, either by the act of 1813, or by the Eevised Statutes, save with the consent in writing of two justices of the peace, the commissioners of charities and correction are not under that restriction; for by the act of 1813 the commissioners of the alms-house had power to do every act under the statute “ concerning apprentices and servants ” in the same manner as though they were justices of the peace of the city and county of New York. They combined in themselves the powers and duties in this respect of the overseers of the poor of a town and of the justices of the peace of the city and county. And to these powers the commissioners of charities and correction succeeded by force of the act of 1860.
They thus having the power to bind out a child who is chargeable to the city, it is now to be seen whether the child in this case came within that description. She did not come into their care and custody as such. She was received from her father, upon an agreement upon his part with the commissioners to pay for her board at a stipulated rate per month. For one month he did pay it, but never after; and never came to see her but once after leaving her with them. Her mother was dead, and after the expiration of the month for which her board was paid she was, as the return avers, in the custody of the com *390 missioners, and cared for and supported by them as a pauper. It is claimed by the relator, that having entered into their care and custody as a paid-for boarder, upon an agreement to that end, she could not be there otherwise, until there was an abrogation of the agreement and a discharge of her from their custody. The father was out of the State. It does not appear that he informed the commissioners whither he was meaning to go, or where he was, or that they knew thereof. How could they return his child to him, or notify him to remove her % There was but this alternative for them : to retain her in their care and furnish to her the support she needed, at the public expense, or to dismiss her from their custody. But it is quite certain that, had she been dismissed from their care and custody, because the father did not pay for her board after the first month, she would at once have become chargeable to some charity, and necessarily in the first instance to the public charity over which these commissioners presided. She was as much thus chargeable, being retained in their custody and care, as though turned into the street for an hour or a day, and in due form of law returned to their control as legally chargeable upon the city. Moreover, the allegation of the return is, that she was guarded' and cared for as a pauper, and it does not appear but that the legal steps were taken, if any were necessary, to place her in that predicament. We think, that after the father had left her in the care of the commissioners, neglecting after the first month to fulfill his contract with them, or by visiting his child, or by inquiry as to her condition, to take any responsibility for her, or to acknowledge a liability for her support, that she might well be treated as a child chargeable to the city. She was so in fact, for there was no one, so far as appeal's from the papers, within the jurisdiction of the commissioners of charities and correction, to whom she could look for support, or whom the public authorities could look to or compel to support her. She was in fact a pauper; who is one so poor that he must be supported at the public expense. And if a pauper, unable to support herself, then she was chargeable to the city; for *391 to be a burden is to be chargeable, as a charge is a burden. The case of Schermerhorn v. Hull (13 J. R., 270), shows, that to render one a pauper in law there need be no legal proceedings declaratory of, or producing that state, but that if one is a pauper in fact, and applies for relief from the public, and receives it, he is a pauper within the meaning of the statutes. If this child had been an adult, and had been, in the language of the statute, “ blind, lame, old, sick, impotent or decrepit, or in other way disabled or enfeebled, so as to be unable by his (her) work to maintain himself (herself)” (1 R. S., p. 616, § 14), she would have been entitled “ to be maintained by the county or town in which ” she “ might be.” (Id.) That she Avas of tender years does not exclude her from the benefit of the statute, for she was by her youth “ disabled * * * so as to be unable by her work to maintain herself.” And the poor laws do recognize the fact that minors may be paupers and chargeable upon the public for support. (1 R. S., p. 621, § 29; p. 614, §§ 1, 2, 4; 1 R. L., p. 286, § 21; Laws of 1821, p. 114, § 4.)
W e are brought to the conclusion that this child was in such condition that she was within the acts in relation to the binding out of minors as apprentices and servants, and that the commissioners of charities and corrections had legal authority and power to take measures to bind her out as an apprentice.
. It remains to inquire, whether the commissioners duly exercised their authority and power, and whether the child Avas, in accordance with law, bound out as an apprentice to the respondents. It is claimed that the indentures are void, because not signed by the infant in person. It is the law, that the indentures must be executed by the infant. (In re McDowle, 8 J. R., 328; People ex rel., etc., v. Gates, 43 N. Y., 40.) It is not certain that in this case, the instrument was not so signed. It is first executed by the respondents. It is then executed as follows:. “ G. W. Kellock, Supt. of P. D., for Ellen Wehle.” The child was then but six years and three months old, and it may Avell be was not herself able to *392 write. It is not improbable; it is probable and fairly infer-able, that with such power of choice and will as she then had, she, in her inability to write herself, did authorize Kellock, the superintendent, to execute the paper for her. This return is before us without traverse, and upon a demurrer to it, which admits all the facts stated in it, and permits all inferences which may be lawfully drawn from those facts. In aid of the inference above made is the further fact, that the child had been in the family of the respondents for about four months, and knew them, and what their treatment of her had been. But had she not executed the indentures, the omission so to do cannot be availed of by the parent, where he has duly given his consent to the binding out; thus held In re McDowle (8 J. R., 328), a case often cited and approved of. The parent, the relator, did not himself execute or consent to the indentures, but the commissioners who stood m loco parentis, who by law had the power and authority of the parent, did ; and thus the indentures as to him are as valid as though he had acted personally in their execution.
It is claimed by the relator that the indentures are void, for that the respondents have not executed the obligation required by chapter 411, Laws of 1869. The fourth section of that act requires that when any child shall be bound out from a public or private institution, the person receiving it shall be required to sign an obligation to the people of this State, by which, in addition to the requirements of law existing before that act, he shall undertake to kindly treat such child. It does not affirmatively appear that this obligation was not required and taken. But conceding that it was not, it was not an omission of which the relator can avail himself. The act is, as its title expresses, “for the better protection of minors,” and if this requirement of it has been omitted, it is a failure of duty which the minor can perhaps avail himself of to avoid his indentures, but may not be used to that end by one in the position of the relator.
As to the point taken upon the fact that this child is now called Maimi Wiessenbach instead of her name of Ella Wehle; *393 and upon the third section of the act last cited, that it shall not be lawful at any time to change the name of any child admitted to such institution, it is to be said that this prohibition does not avoid indentures made previous to the disobedience of it. What the penalty may be for the disobedience, it is not now to say.
It thus appears that this relator has no legal ground upon which he can of right avoid these indentures. If it should be conceded that they are not binding upon the child named in them, it does not follow that she is to be committed to her father, on this proceeding, irrespective of any wish or will which she may have in the matter. It is not necessary that we add any thing to the elaborate discussion of the learned justice at Special Term upon this branch of the case. The writ of habeas corpus is a writ in behalf of liberty, and not for the enforcement of a right to service. It will, with the first named great end in view, be used as is for the best interests of the person alleged to be restrained of his liberty. Its purpose is generally served when he is freed from restraint and free to go or stay with those in whose care he has been. And even in the case of a child of as tender years as this, her inclination and choice will be ascertained, and in the discretion of the court will be yielded to. (In re McDowle, supra.) In this case the court below has exercised its discretion. It does not appear that such exercise has been willful or arbitrary, or otherwise than for the happiness and good of the child. While we can understand and appreciate the feelings of a parent who from good motives seeks the care, custody and society of his own offspring, we are not able to find ground in this case for this court of review to disturb the action of the court below.
The case cited of Wilcox v. Wilcox (4 Kern., 575), is not in conflict with these views. There the action of the Supreme Court was affirmed, and this court expressed its judgment that such action was in consonance with the best interests of the minor. In this case we are not able to say, from the facts shown, that there has not been the same result.
*394 The order appealed from should be affirmed, with costs.
All concur.
Order affirmed.