## THE STATE v. PHELPS, *Appellant*.

1. **Confessions as Evidence.** A confession not induced by promises or threats is admissible in evidence, notwithstanding it was obtained by artifice practiced upon the prisoner by the officer having him in charge, and, when properly corroborated, will sustain a conviction.

2. **Practice, Criminal:** INSTRUCTIONS. In criminal cases there is no express statutory requirement that the jury shall take the instructions to their room; and, if there were, in a case as plain as this the refusal by the trial court to allow them to do so would not justify a reversal.

*Appeal from Saline Circuit Court.*—HON. JOHN E. RYLAND, Judge.

AFFIRMED.

The testimony showed that the body of the deceased was found on Saturday night, the 23rd day of April, 1881, about 300 yards from the house occupied by Charles L. Wood and family; that Wood and defendant were together at the house on that night; that deceased was heard by them calling cows; that shortly afterward, Wood went

into another room leaving one of his children with defendant; that, a few minutes afterward, the child came in and said defendant had gone to the stable; that a few minutes after that, defendant came back and inquired where deceased was, and then, at the instance of defendant, he and Wood went to look for deceased and found him dead at the place mentioned; that, on the next day, from a point about forty yards from the place where the body was found, tracks, about six feet apart, were found leading to and from the house; that defendant's boots worn by him on Saturday, together with the nails in the boots, corresponded exactly with the tracks; that there were three wounds on deceased, one on each side, and one on the back of the head; that after his arrest defendant said to the sheriff that he had killed deceased and had taken his money, and if the sheriff would take him down to the farm, he would get the money; that the defendant did recover the money he claimed to have taken, from the spot where he said he had plowed it under; that deceased had received $100 on the day he was killed; that before defendant made any confession of the killing, he was told by the officers having him in custody that he had been tracked to and from the point where deceased had been killed; that he had been seen running across the field that night; that the evidence was straight against him, and that there were but two penalties for such an offense, the gallows or the State prison; that defendant was prevented from talking with the counsel he had conditionally employed; that he was told the girl to whom he was engaged had " gone back upon him," and an engagement ring which he had given was then returned to him for the purpose of discovering the effect which it would produce; and that he was in a state of great excitement.

W. H. Letcher, Samuel Davis, Leslie Orear and C. M. Hawley for appellant.

D. H. McIntyre, Attorney General, for the State.

9 - 74

SHERWOOD, C. J.—The defendant was indicted for the murder of Elijah Keyton. On trial had, he was convicted, and now appeals here. The testimony upon which he was convicted consisted in a great degree of extrajudicial confessions, both oral and written. The latter is as follows:

STATE OF MISSOURI, } ss.
  County of Saline,

I, John A. Phelps, do voluntarily make this, a full and complete statement in regard to the killing and murder of Elijah Keyton in Saline county, Missouri, on Saturday evening, April 23rd, 1881. I was born in Adair county, Missouri, eight miles southeast of Kirksville. My parents are both dead. My mother died in June, 1874. My father died on the 5th of April, 1878. I lived in Adair county until I was four years old. I went with my parents to Cedar cou ty, Missouri, and lived there until I was sixteen years old. I went back to Adair county and lived there one year. I came to Saline county, and will have been here four years next September. I was born on the 14th day of September, 1859. I commenced work for Mr. Keyton March 8th, 1880, on his farm in Saline county, near Arrow Rock. I worked for him up to September 27th, 1880. I then went to work for John Durrett, and worked for him until January 24th, 1881 I then went to work for Mr. Keyton again. Mr. Keyton said he could not get a hand up at his farm near Herndon (four miles southwest), and took me with him. This was on the 18th of the month we went out there. I drove the wagon and he rode horseback. I drove two bay horses. We got to the farm about half past seven o'clock in the evening. On the next day, Tuesday, we went to hauling posts. Mr. Keyton, myself and Charles Wood hauled the posts. Mr. Keyton put on thirty-seven posts, and I put forty-seven on my wagon—Wood put on fifty. My team could not pull the load up the hill, and I went to make a short turn and broke the wagon. Mr. Keyton hauled all his posts home, and

Wood threw all his off but thirty-seven. I went home without any load. When I got home Mrs. Wood asked why I did not bring a load of posts. I told her I broke my wagon and could not fetch them. Mr. Keyton said: "Yes, the helled fool went that far to break a wagon down this morning." I said: "Yes, sir, and I done it, too." I went after the team, and Mr. Keyton said: "You've got no team to haul posts." After he hitched his team up he showed me where he wanted me to work. He put me to digging post holes and setting posts. I set posts until Thursday night. Friday morning he put me to flattening pickets, and Saturday he had Mr. Wood and myself to put the pickets in the wire. Mr. Keyton came out about eleven o'clock where we were at work. He asked us what was the reason we had not gotten any farther in putting in the pickets. Mr. Wood told him we had never made any fence of that kind, and Mr. Wood asked him if he thought we had not done enough? Mr. Keyton said: "No, I think I could have gotten along faster." Mr. Wood told him if he (Keyton) was not satisfied with his work, to say so, and he would quit. Mr. Keyton then went to putting in pickets, and I twisted the wire for him. When he would go to put in a picket I would have the wire twisted, and he would say: "Be dods, I want that wire twisted, and not be standing there doing nothing." He put in twenty-five or thirty pickets, and said he would count how many they put in yesterday, and see if we had put in as many as they did. Mr. Keyton then left and went to Brownsville. After he left, Mr. Wood said he would take a club and knock his brains out. I just said to him: "Mr. Wood, you have not got nerve enough to do that." I just told Wood if he would say nothing about it that I would knock Mr. Keyton in the head. Mr. Wood said: "I wish you would; I have threatened to do it myself." Mr. Wood said if I would knock Mr. Keyton in the head, that we would bury him, and tell his family and others that inquired about him that he (Keyton) had gone southwest. This was

Charley L. Wood I have been speaking of. Wood then said : " I will tell you a better plan than that." I asked him what it was. Wood said, we will get him to go and watch the oats stack, and when we got him to the straw stack we would kill him and put him in the straw stack, and set fire to it and burn him up. This conversation took place while we were at work. We both went to the house together about seven o'clock Saturday evening, April 23rd, 1881. I stopped at the stable to feed, and Mr. Wood went to the mule lot. Mr. Wood returned from the mule lot about half past seven o'clock, and Mr. Wood said : "John, I want to have a talk with you," and we went to the granary out in the yard, and Mr. Wood said : "John, you can go and get that axe; Mr. Keyton has gone to the far part of the pasture, and you can go up there to the mule lot, and when he comes along, you step up behind him and knock him in the head." I went down to the barn and got the axe, and went around up the hollow north of the house on the outside of the fence, until I got within about 100 yards of the northeast corner of the wheat field, in which the house is situated. In crossing this hollow going up I jumped the ravine. I then crossed over this fence and went through the gate where Mr. Keyton was found dead —the gate into the pasture east of the house. I saw Mr. Keyton coming, and I got inside of the mule lot south of the gate, and when Mr. Keyton came along I stepped out behind him, and when he got close to the gate I struck him on the right temple with the axe, and the lick knocked him down to the ground. He never made any noise of any kind. I then took his pocket books, both of them, out of his pocket. He had them in his left breeches pocket. I then took the money out of them and put it in my pocket. I then scattered the papers around his side. I noticed him making a little noise, like he was groaning or trying to get his breath. I then struck him on the left temple with the axe. I then started away, and thought he might not be dead, so I went back and struck him on

the top of the head with the back part of the axe. I then went through the gate and struck across the corner of the wheat field, and climbed the fence about the same place as I did going up, as near as I can recollect. I went around back to the barn and left the axe at the barn. I then went to the house and asked Mr. Wood if Mr. Keyton had come back. He said he had not. I told Mr. Wood to come to me a minute. He put the child out of his arms and came. I told him I had killed Mr. Keyton. Wood said: "Let us go to the barn, John, and get the axe you left down there." As we were going to the barn, Mr. Wood said: "Let us take him to the straw stack and burn him up." I told him I could not do that. I told him when we went back to the house we would call him. I went to the door and called Mr. Keyton. I asked Wood to let us go and see about him. Wood said: "We will tell them that Keyton had gone to watch his oats, and they will think that old Kinnikin killed him." When we got there, Wood hallooed out, "Lord, there he lies dead!" This was while we were on the inside of the gate, next to the house. Mr. Wood went in and shook Mr. Keyton, putting his hand on his back, and calling him Uncle 'Lijah. I picked the papers up, and while I was picking them up asked Mr. Wood whether I must do it or not. He says: "Yes, I'll swear I saw you pick them up." We then ran back to the house right down the road. When we got to the house I hallooed to Mrs. Wood, and told her that some one had killed and robbed Mr. Keyton. Mrs. Wood just remarked: "That was old Kinnikin." She said: "That was what I expected when you all went up there." Charles came in and said: "Yes, I thought that old Kinnikin would kill him when he went up there." (I mean by Charles that it was Charley Wood.) I said: "Charley, I will go down and tell the folks at home." He says: "Go by and tell Joe Cowic and his father to come over." I told him that as soon as Joe Cowic came over, to send Jim Wood word. I told Charley that as I went through Herndon I would

The State v. Phelps.

tell the people there. Charley told me before I started that he would tell that Mr. Keyton went to watch his oats and was robbed. I said yes, tell them that he was killed. I said to Wood: "Don't you tell anything I have said." Wood said: "No, I would rather give my right arm away than to tell it on you, for I am glad you did it." I then went on over to the home farm and told his folks. I did not go back with the family, but changed my clothes and put on my Sunday clothes. Mrs. Keyton, Miss Martha Keyton, Miss Nancy Keyton and Jim Parks left about one o'clock Sunday morning to go to the place where Mr. Keyton was killed. I staid there until four o'clock, and got my horse and went back there by myself. I took the money back with me in my pants pocket on Sunday morning. I got out there about twenty minutes before eight o'clock. When I got there Charles Wood called to me and said he wanted to see me. He was down between the house and barn unhitching the team. I asked him what he wanted, and he said: "Go into the barn." When I got to the barn I asked Wood whether they had suspicioned any one or not. He said: " Yes, they have suspicioned old Kinnikin." He said: " John, don't say another word about it, and don't whisper it to any one." He said: "I'm as deep in it as you are, and if they find it out on us they'll hang us both." This was said in a whisper. I then went back to the home place east of Marshall. When I got down there they had the grave dug. I told them they would not be there to bury him before the next day. They came down on Sunday night, and got there about eleven o'clock. When Mr. Cason came down on Monday, I was at the grave and had the money in my pocket, and I went down in the cellar and put the money under some straw. As I was going down toward the cellar I called Charley Wood and told him I wanted to see him a minute. He said: "I'll be down directly." When he came down I told him that was Mr. Cason and Sail Aulgur; that they had come down to find out something. He said: "John, tell

the same tale every time, and don't change it any, or they will take us up on suspicion." On Tuesday Charley Wood went back to the farm where Mr. Keyton was killed, and when he came home I met him at the gear house about half past nine that night, and he said: "Let us not say anything about that, nor whisper it to any one." I told him no, not to say anything about it; that I did not think they would suspicion us at all. He said: "John, I don't believe you did that." I told him I did, and how I did it. He says: "From what I swore, if they find it out, they will do as much with me as they would with you." He says: "I don't think you were gone long enough to have done that." He says: "They don't think it was done with an axe, but they think it was done with a club." On Wednesday I was plowing in the field, and when I saw Cason approaching I took the money out of my pocket and threw it in the furrow and plowed it under. I first counted the money Saturday night at James Parks', upstairs; I was by myself; he had gone after his horse to go with the family. There was $87.65. When Mr. Cason and Mr. Aulgur went with me to-day to the place, I went and kicked the money up, and Mr. Cason picked it up and now has it in his possession. It had been in my mind three weeks before to kill old man Keyton, but I never made up my mind fully to do it until I went over on Blackwater. It had been suggested to me to kill him.

This statement is freely and voluntarily made by me, this 29th day of April, 1881.

JOHN A. PHELPS.

Signed in the presence of:
    DEAN D. DUGGINS,
    JOHN R. CASON,
    SAIL C. AULGUR.

## I.

It will be observed that the written confession is very particular in all its details respecting the commission of

the murder, and of many occurrences subsequent to that event. The more formal confession, though more in detail, is not materially variant from the prior verbal confession. It is strenuously insisted by counsel for defendant that neither confession should have been admitted in evidence. We are not of this opinion. At the last term of this court in the *State v. Patterson,* 73 Mo. 695, we had occasion to examine the authorities quite extensively relative to the question of the admissibility of confessions. It is unnecessary that we go over the same ground again. In this case, as in that, neither threats nor promises were employed to extort a confession; no inducements were held out to the prisoner to flatter his hopes or to arouse his fears. In this case, as in that also, the testimony of witnesses, and the circumstantial evidence are wonderfully coincident with the details of the confession; as to the money of the deceased being in the defendant's possession; as to the number and character of the wounds inflicted; as to the instrument with which those wounds were given; as to the tracks made in the field being fitted exactly by defendant's boots, and as to the other incidents immediately attendant on the killing; thus corroborating that confession as fully as could be desired. As the substance of the evidence will accompany this opinion, it is not deemed necessary to do more than to refer to the testimony in this general way.

There is one particular, however, wherein this case differs from *Patterson's case,* and that is, here the officers in charge of the prisoner asked questions and used artifice, cunning, falsehood and deception to obtain a disclosure from the prisoner. But no law is better settled than that such practices will not render inadmissible a confession obtained by such means. *State v. Jones,* 54 Mo. 478, and cases cited; *State v. Staley,* 14 Minn. 105, (*loc. cit.* 113;) *People v. Wentz,* 37 N. Y. 303; *King v. State,* 40 Ala. 314; *People v. McMahon,* 15 N. Y. 391. In cases of this sort, " The real question, (as said by Keating, J., in *Reg. v. Reason,* 12 Cox Cr. Cases 228,) is, whether there has been any threat

or promise of such a nature that the prisoner would be likely to tell an untruth from fear of the threat, or hope of profit from the promise." The many points of agreement between the matters confessed and those established *aliunde* wholly forbid the idea that the prisoner falsely accused himself of that whereof he was innocent.

## II.

Relative to the instructions it is enough to say that all the instructions asked on defendant's part were given, and that the 5th and 6th instructions given on behalf of the State, fully and correctly define the offense of which the defendant stands convicted; and that the others, if incorrect, were harmlessly so, and could not have worked the defendant any hurt. *Patterson's case, ubi, supra.*

## III.

If any error was committed by the court in reference to a question propounded to Chas. L. Wood, it was a harmless error, and could not possibly affect the result one way or the other.

## IV.

The same may be said respecting the taking of the instructions by the jury, when retiring to consider of their verdict. The statute does not in criminal cases, as it does in civil, expressly require that the jury take the instructions with them to their room; (R. S., §§ 3655, 1906, 1907, 1920;) if it did, the refusal by the court in a case so plain as this record presents, should not be permitted to work a reversal of the judgment. As to the case of the *State v. Tompkins,* 71 Mo. 613, it merely decides that it was not an error, that it was in the discretion of the court to permit the jury in a criminal case to take the instructions with them when they retired.

Finding no substantial error in the record, we affirm the judgment, and order that the sentence pronounced be carried into execution. All concur.