THE STATE v. JAMES WILLIAM PAYNE, Appellant.—56 S. W. (2d) 116.

Division Two, December 31, 1932.

*R. B. Bridgeman, K. D. Cross* and *Jno. E. Heffley* for appellant.

998

*Stratton Shartel*, Attorney-General, and *Ray Weightman*, Assistant Attorney-General, for respondent.

FITZSIMMONS, C.—Appellant was found guilty of manslaughter and his punishment was assessed at seven years in the penitentiary. From the judgment he appeals. He was charged with murder in the second degree for causing the death of his wife, Lillian Payne, by striking her on the head with a piece of wood. The couple lived on their farm in Holt County about five miles south of Oregon, and the assault was alleged to have been made on April 1, 1930, while appellant and his wife were walking home. Mrs. Payne died nineteen days later in a hospital in St. Joseph, Buchanan County. The information was filed in Holt County. Upon change of venue, appellant was tried twice in Andrew County. At the first trial he was convicted of murder in the second degree and his punishment was fixed at twenty years' imprisonment. A new trial was granted and had, and it resulted, as has been stated, in a manslaughter verdict.

I. The first assignment of error is the refusal of the trial court to sustain a demurrer to the evidence. Appellant and deceased had been married about twenty-five years. She was his second wife and he had children from both marriages. On April 1, 1930, Payne and

his wife left their home, sometime about noon, to attend a school district election at the school house, a mile away. They walked across fields to a public road on which they met Charles Lee. The latter informed Payne he was too late for the school election. Payne then called his wife a fool and inquired of her how she expected to get the taxes down if she did not get to the school to vote them down. The couple walked back with Lee along the road a short distance, and then they entered a wheat field to take a short cut home. When they were well into the field and were about one-half mile from their home, Lee saw appellant, Payne, stoop, pick up an object and put it under his left arm. The object was small and was not a post or piece of wood of the dimensions stated in the information. Lee, continuing along the road, met Arnold Guy, who turned into the same field which the Paynes were crossing. When Guy was about half a mile from the Paynes in the field he saw the woman "standing over like this (indicating.)" But the record does not further explain.

Viola Payne, a daughter of the couple, fifteen years old and a pupil in the district school, was at home when her parents went to the election. Upon their departure, she visited a neighbor named Mrs. Forney, but she testified that she was back home when her parents returned. She then observed that her mother had a cut upon the side of her head and that blood was clotted about the wound and in her hair. Viola went into the field over which her parents had walked and found there a pool of blood, also a fence post, about two or three inches in diameter, with a nail projecting from one end. There was blood on the post about the nail. She laid the post against the fence, but she could not find it when she searched for it later. No treatment was given to the wound, and Mrs. Payne, for the next ten days, worked in the corn field, as had been her custom. In the meantime, she complained of pains in her head and mouth. Her jaw was swollen and she could not eat. She went to a doctor at Oregon, Missouri, on April 10, and again on April 13. On the latter date, the doctor sent Mrs. Payne to a hospital in St. Joseph where she died on April 19.

■ One of the principal grounds advanced by appellant in support of the demurrer is that the evidence was wholly circumstantial and was not inconsistent with his innocence. In his motion for a new trial appellant conceded that the testimony of the daughter, Viola, connected him with the piece of wood, described in the information. But he contended in his motion that Viola Payne "demonstrated while on the witness stand that she was so weak mentally and so irresponsible that her testimony was not worthy of consideration and that it would be unsafe and unjust to permit a verdict to stand which was in any wise based on the testimony of this witness. She

testified three times in the case and at each trial her testimony was materially different.'' Of these differences the principal ones were disparities as to the length of time Viola was at the home of Mrs. Forney on the afternoon of April 1, also as to where she found the pool of blood and the post in the field. Viola testified to frequent quarrels in which her father threatened or struck her mother. In one of these quarrels, Viola testified, appellant threw a water bucket which hit the mother and also the baby, in the mother's lap. At one point, Viola stated that the baby was one year old. But later she said that the baby was eight years old, and the latter age appeared to be established. Upon the record it is not for us to hold as a matter of law that Viola demonstrated that she was so weak mentally and so irresponsible that her testimony was not worthy of consideration. The trial judge saw and listened to Viola while she was testifying. He had an opportunity to observe her conduct, demeanor and appearance. He heard her self-contradictory statements. He later had before him the motion for a new trial charging that Viola was mentally weak and irresponsible. By overruling the motion, he, in effect, refused to accept appellant's appraisal of Viola as a witness. The record does not warrant us to question the soundness of this ruling in respect to Viola's credibility.

Appellant, in his motion for a new trial and here, also urges in support of his demurrer that ''the wound alleged to have been inflicted upon the deceased by the defendant was not a mortal wound from which the deceased died. It is insisted by the State that deceased died from tetanus poisoning contracted in the wound, which it is alleged that defendant inflicted upon the deceased's head, but there is no substantial evidence to show that this is true.''

Mrs. Ethel Eberhart, at whose house Mrs. Payne called on her two visits to the doctor in the town of Oregon, testified that on April 10, Mrs. Payne's head and mouth were drawn to one side, and it was difficult for her to talk or to swallow. These conditions were much worse on April 13, the day that Mrs. Payne went to the hospital. The doctor in Oregon testified that he found a scalp wound on the left side of Mrs. Payne's head. It was about an inch long and extended down to or nearly to the skull. He gave it a local treatment, the first time she called on April 10. But he observed, on her second visit, three days later, that Mrs. Payne ''was developing tetanus,'' or lockjaw. She had rigidity of the neck and of the jaw muscles. The only wound discoverable to him was the one mentioned, and he was of opinion that tetanus germs had entered through that wound. He saw her again on April 16 at the hospital in St. Joseph and her condition was considerably worse. The doctor further testified that the tetanus germ could be introduced through any break in the skin

and that the size of the break made do difference. This doctor gave it as his opinion that Mrs. Payne died of tetanus.

Dr. D. W. Tadlock, a practicing physician of St. Joseph, and, at the time of the death of Mrs. Payne, coroner of Buchanan County, officially viewed the body of Mrs. Payne and made a superficial examination. He found the scalp wound on the left side of the head to which reference has been made, but no other abrasions. The scalp wound itself, he swore, was not sufficient to produce death. He also testified that tetanus germs can only be introduced into the human system through an open wound. In answer to a hypothetical question predicated upon the symptoms shown by Mrs. Payne, Dr. Tadlock gave it as his opinion that she was suffering from tetanus. He also expressed the opinion that the tetanus germs entered through the lesion in the scalp. The coroner did not perform an autopsy or make a microscropic examination of a culture taken from the wound. He was not permitted to testify to the cause of death stated in the death certificate which he prepared. On the issue of the cause of death Coroner Tadlock testified on cross-examination as follows:

"Q. Now, doctor, from the examination you made of the body, from the examination now you made of the wound, after Mrs. Payne's death, you would not be willing to even say she died from tetanus poisoning, would you, from that examination? A. Well, just limiting it to that, I couldn't say that she died with it."

"Q. And from your examination you made of the wound after she did die, if she died of tetanus poison, you could not say that the tetanus entered into that particular wound, could you—from your examination? A. Well, since we found only one lesion, I would say that the tetanus germ did enter that particular lesion." The court sustained an objection to the admission in evidence of a record produced by a laboratory technician of the hospital in which Mrs. Payne died. An undertaker testified that he made a complete examination of the unclad body of the dead woman and found only one wound, namely the one on the left side of the head.

In his own behalf, appellant, a man sixty-eight years of age and a farmer, testified that, while he and his wife were returning home across the wheat field, she threw a chunk which hit him in the shoulder. He threw it back and hit her "behind here" the part of the body indicated not being shown by the record. He denied that he hit her in the head with a chunk or with a post. He testified that his wife received the head injury while she was crawling through a barbed wire fence on their way home. He denied the testimony of the daughter, Viola, as to his threats, quarrels and blows. Appellant also denied on cross-examination that he said to the local undertaker at Oregon that the wound on his wife's head was caused by

an accidental fall in the family kitchen. The undertaker, called in rebuttal, affirmed this statement of appellant.

■■ The pith of the second phase of the demurrer is that the *corpus delicti* was not shown. We do not accept this view of the record. In Kelley's Criminal Law and Procedure (4 Ed.) sec. 473, the rule is correctly stated thus: "In criminal homicide the *corpus delicti* consists of death of a human being and the criminal agency of another as the means thereof and it may be proved by circumstantial evidence." Five Missouri cases are cited in support of this statement of the law. But the proof of the criminal agency of the accused is not an essential element of the *corpus delicti*. although such agency must be shown after the fact of a crime has been established in order that a conviction may be had. See separate concurring opinion of BLAIR and WHITE, JJ., in State v. Joy, 315 Mo. 7, 285 S. W. 489, l. c. 494; also see State v. Gillman, 329 Mo. 306, 44 S. W. (2d) 146. The older text-books and opinions held that the essential elements of the *corpus delicti* could not be proved by circumstantial evidence. But that rule has not been recognized in Missouri for some time. [State v. Schyhart (Mo.), 199 S. W. 205, l. c. 211.] ■ In the instant case, it was clearly established that Mrs. Payne died in a hospital in St. Joseph on April 19, 1930; that on April 1, the same year, she suffered a scalp wound which was not even washed at the time; and that a few days later she showed symptoms of tetanus. It appears that the local doctor at 'Oregon did not observe or note signs of tetanus when Mrs. Payne visited him on April 10. But when she called again on April 13, he saw that she was developing the dread disease. And when he visited her in the hospital April 16, she was much worse. There was abundant evidence that tetanus is an infectious disease, the germs of which enter the human system through skin wounds, and that there was no other abrasion on the body of Mrs. Payne except the mentioned cut on her scalp. The medical witnesses testified it is possible for tetanus to develop after the healing or closing of the wound through which the germs have passed into the body. But they were definite in their opinion that, in the case of Mrs. Payne, the disease was due to the scalp wound. There is no merit in the point that the wound itself could not cause death. The same objection might be raised to most, if not all, mortal woundings. Death comes from the internal consequences of the exterior wound. If a blow on the head causes concussion or fractures the skull, there may arise fatal brain disturbances. Other injuries, usually minor, sometimes set up pneumonia, with death as a consequence. In these cases the pneumonia is called traumatic, that is to say, caused by a wound. A scalp wound that might result in tetanus or other fatal infection should be as proximate a cause of death as

a head wound at the same point that might crush the skull of the victim and produce mortal disorders in the brain. There was sufficient circumstantial evidence to make it a jury question whether appellant struck his wife with a post, and thereby caused a scalp wound resulting in tetanus and death. We are of opinion that the demurrer was rightly overruled.

II. George E. Gelvin, Sheriff of Holt County, testified that, while Mrs. Payne was in the hospital in St. Joseph, he went to the Payne farm and said to appellant: "Your wife said you hit her in the head with a post." Payne answered: "I didn't. I hit her in the head with a chunk." On cross-examination the sheriff testified that in fact he had not talked with Mrs. Payne. Joe Forney testified that he was present and heard this conversation between the sheriff and appellant. The admission of the testimony of the sheriff and of Forney over the objection of appellant is assigned as error. Appellant cites many cases in which statements of murdered persons made before death, were held to be inadmissible either because they were not part of the *res gestae* or because they were not dying declarations. In the instant case the meat and substance of Sheriff Gelvin's statement was the admission of appellant that he had hit his wife with a chunk. It may be conceded that the sheriff used artifice in ascribing to Mrs. Payne a statement which in fact she did not make to him. But the rule is well established that admissions obtained by such means are not thereby made inadmissible. In the case of State v. Phelps, 74 Mo. 128, 1. c. 136, the court held a confession of defendant to be admissible upon the authority of State v. Patterson, 73 Mo. 695. But the court in the Phelps case added (74 Mo. 136): "There is one particular, however, wherein this case differs from Patterson's case, and that is, here the officers in charge of the prisoner asked questions and used artifice, cunning, falsehood and deception to obtain a disclosure from the prisoner. But no law is better settled than that such practices will not render inadmissible a confession obtained by such means. . . . In cases of this sort, 'The real question (as said by KEATING, J., in Reg. v. Reason, 12 Cox Cr. Cases 228), is, whether there has been any threat or promise of such a nature that the prisoner would be likely to tell an untruth from fear of the threat, or hope of profit from the promise.' "

This assignment is ruled against appellant.

III. The oft recurring complaint is again made here that "the court erred in failing to properly rebuke and reprimand" a certain Assistant Attorney-General, "who closed the argument for the state, and to instruct the jury to disregard such argument." It

would not add an atom to the body of the law to set out what the Assistant Attorney-General said, and what objections counsel for appellant made. As happens too often the Assistant Attorney-General in his argument made statements, which were more likely to excite the passions and prejudices of the jury than to aid it in its deliberations. But, as we read the record, appellant merely objected that the argument was improper. The court took this view of it and in each instance said in substance that the argumentative statements were not supported by the evidence. The trial court gave to appellant such corrective relief as the form of his objection warranted.

■ IV. Appellant assigns as error the refusal of the trial court to grant a new trial on the ground of newly-discovered evidence. The State witness, Mary Forney, on cross-examination denied that she told H. M. Dungan, former prosecuting attorney of Holt County who was prosecuting attorney at the time of the preliminary hearing and the former trial of this case, that she did not see how Viola Payne could have known so much about this case and could have gone out there in the wheat field and discovered the fence post, as the witness Viola Payne was at the home of the witness Mary Forney until nearly dark on the afternoon of April 1, 1930. Appellant in his motion, supported by affidavits, alleged that Mr. Dungan on a new trial would testify that Mrs. Forney did make to him the statements which on cross-examination she denied making. Corbin Payne, son of appellant, at the trial testified that he was present at the time and heard Mrs. Forney make to the prosecuting attorney the statements in question. The testimony of Mr. Dungan at a new trial would be but cumulative and it would be material for purposes of contradiction. This is not sufficient to sustain a motion for a new trial. [State v. Willis (Mo.), 37 S. W. (2d) 407; State v. Miller, 144 Mo. 26, 45 S. W. 1104.]

■ V. Appellant assigns as error the giving of State's Instruction 6. If this be error, the motion for a new trial does not specify it, and therefore we must disregard it. [Sec. 3735, R. S. 1929.] There not appearing any reversible error, the judgment is affirmed. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by FITZSIMMONS, C., is adopted as the opinion of the court. All of the judges concur.