THE STATE v. HENRY MARTIN, Appellant.—162 S. W. (2d) 847.

Division Two, June 17, 1942.

*W. S. Pelts* for appellant.

*Roy McKittrick,* Attorney General, and *B. Richards Creech,* Assistant Attorney General, for respondent.

ELLISON, J.—The appellant, Henry Martin, was convicted in the circuit court of Dade County of murder in the second degree and his punishment assessed at ten years' imprisonment in the penitentiary, for killing Alva Shaw. His son, Marvin Martin, was jointly charged and prosecuted for the same offense, but acquitted by the jury. The State's case was based largely on circumstantial evidence. The reviewable assignments of error on this appeal are: that there was no substantial evidence to support the verdict; incompetent evidence was admitted; certain of the State's instructions were erroneous; the jury was guilty of misconduct; and appellant was entitled to another trial because of newly discovered evidence.

On the facts, the general theory of the State was that the appellant had become enraged at the deceased Shaw because of the latter's alleged liaison with his wife; and that with the aid of his son, Marvin, he enticed Shaw into the son's automobile, and drove to the outskirts of Greenfield where he struck Shaw on the head with an iron bar, causing his death almost instantaneously. The defense was that appellant knew nothing of Shaw's alleged intimacy with his wife; that he sought Shaw on the occasion mentioned for the purpose of discussing a trip to Fort Leonard Wood, which they contemplated making to obtain work on certain government projects; that he and his son had no iron bar in the automobile at the time; and that Shaw for some inexplicable reason suddenly opened the back door of the automobile and leaped or fell out, striking his head on the hard gravel road and causing his death.

First, with reference to Shaw's attention to Mrs. Martin, the appellant's knowledge thereof, and his actions thereafter. Herbert "Peach" Henry, an automobile mechanic testified that on February

7, 1941, in Greenfield, Shaw employed him to go to a point twelve miles in the country and fix his automobile, which had broken down. On arrival at the spot he found the appellant's wife in the car. The witness did not know Mrs. Martin at the time, but she was pointed out to him the next day, and he identified her at the trial. About 9 or 10 o'clock A. M: on that next day, February 8, which was the date of the alleged homicide, the appellant, with the assistance of a boy named Spencer Proctor whom he paid for the service, sought out Henry in the basement of the court house, for the stated purpose of having some automobile repairing done. Henry had not known appellant even by sight prior to that occasion, but joined him in drinking about one-fourth pint of whiskey each. Then appellant asked him if he had fixed Shaw's car in the country the day before, and whether Shaw was accompanied by a woman wearing a green coat and black hat. The witness answered affirmatively but did not tell appellant the woman was his wife—in fact did not know it until later that day. Appellant never did have the automobile work done.

To finish this part of the story, both the Proctor boy and the appellant generally corroborated the witness Henry as to the occurrence of the above incident, the appellant admitting he asked Henry if the woman in Shaw's automobile wore a green coat and a black hat. But he declared Henry answered that he didn't know; and further explained he put the question to Henry in that form because his wife's *sister* had a green coat and black hat, and since Shaw had been trying to keep company with the sister he thought she might have been the woman with Shaw. His wife's coat, he said, was light blue. On cross-examination he denied his wife was wearing a green coat and black hat at the coroner's inquest over Shaw's body five or six hours after his death. Sheriff Johnson testified the wife was so attired at the inquest; that he talked to her for a considerable period of time that night and noted the above fact because he had heard the woman with Shaw the day before was similarly dressed. Sergeant Viets of the Highway Patrol and Charley Meyers corroborated the sheriff on this issue. The wife's sister, Miss Iva Phipps testified she owned a green coat and black hat at the time. But she said she did not know whether the wife, Mrs. Martin, owned or wore such clothing on that day; and she did not testify she was the one with Shaw instead of Mrs. Martin. Appellant's wife did not testify, doubtless under the privilege accorded by Secs. 4081 and 4082, R. S. 1939; Mo. R. S. A., secs. 4081, 4082. The defense impeached witness Henry by showing he had been convicted of petit larceny.

Remembering the conversation between appellant and witness Henry occurred about 9 or 10 A. M. on February 8, there was testimony from twelve other witnesses tracing ▮▮▮ appellant's movements in Greenfield and the neighboring country during the morning and afternoon of that day. Some of this testimony showed appellant

was drinking and looking for Shaw, and in two or three instances inquiring about the previous day's automobile incident implicating his wife and Shaw. Much of this testimony was not disputed. Early that morning he consulted a lawyer, Gordon Weir, about bringing a law suit but the court excluded testimony as to the nature thereof because it was privileged. He talked to Herman Grisham and his son Raymond, who had brought Shaw to Greenfield the day before, after Shaw's automobile broke down. Herman Grisham informed appellant he had heard a woman was with Shaw on that occasion. Later in Greenfield appellant approached the son, Raymond Grisham; declared he was a "square shooter;" that he wanted "to know the facts about this;" and inquired if Raymond and his father had brought Shaw to town the day before, and whether they saw anybody with him.

About 11:15 A. M. at the telephone office in Greenfield appellant placed a call for his son the co-defendant Marvin Martin, a taxicab driver in Joplin, and waited about 30 minutes to get it through. The operator heard him ask his son "How long will it take you to get up here?" She thought the son answered by inquiring "What is the matter? Is it Ma?" Appellant's and his son's version of this part of the conversation was that the son responded: "Have you got anybody to do mother's work?" The distance from Joplin to Greenfield on the State Highway is at least 62 miles, of which we take judicial notice. Richard Shaw, a son of the deceased, saw Marvin Martin in Greenfield with appellant about 1:30 P. M., within less than two hours after their telephone talk. On that occasion appellant gave young Shaw a drink of whiskey out of a bottle with a red label and a cork in it. Appellant informed the witness he was urgently seeking his father; told him to tell the father to come out to his (appellant's) farm no matter what time it was; and talked about driving out to the deceased Shaw's farm. Then he added: "This concerns you as well as him."

Two hours later while Shaw's body was still lying in the road, young Shaw asked appellant what he had meant by the statement just quoted, and appellant denied making it. On this point witness Shaw was corroborated by Richard Scott. At the trial appellant admitted he might have made the statement, but if he did he had reference to the fact that he (appellant) and young Shaw's father, the deceased Shaw, were planning to go to work at Fort Leonard Wood. Another witness named Herschel Claybaugh met appellant in Greenfield about 2:30 in the afternoon. They had drunk together that morning. Appellant appeared intoxicated and Claybaugh cautioned him, to which appellant replied, "I might be in jail before morning."

Appellant was seen in Greenfield by other witnesses between 3 and 3:30 o'clock that afternoon, which testimony apparently conflicts as to time with that of appellant, his neighbor and witness Bryan Lovely

and the defendant Marvin Martin, to the effect that Lovely had taken appellant to Greenfield that morning because the latter's automobile would not run, and waited for him until shortly after the telephone talk, when they went back out to appellant's farm 8 miles north of Greenfield. The defendant Marvin Martin testified he was "already packed and everything," when he received the telephone call, so he drove from Joplin to appellant's farm. From there they drove back to Greenfield in Marvin's car to see the deceased Shaw about going to Ft. Leonard Wood. Not finding Shaw, Marvin drove out to his farm 9 miles north of Greenfield, got Shaw and brought him to town in his work clothes. At any rate, it is undisputed that about 4 o'clock appellant and his son defendant Marvin Martin were in the front seat of the latter's automobile in Greenfield, and the deceased Shaw got in the back seat. Appellant testified Shaw inquired if he wanted a drink in answer to which he suggested that they "drive out of town."

This brings us to the time and scene of the alleged homicide. Witnesses Ed Scroggs and Ben McConnell were driving on a street in the south part of Greenfield when they saw an automobile approach from the west on a cross street and turn south ahead of them. Just after it had straightened out from the turn, which required a southerly movement of over 30 feet, the left rear door suddenly opened back and a man's body jumped or fell out, with arms limp and horizontal or higher, and his hat still higher in the air. From the posture of the body there was apparently no effort to break the force of the fall. It was facing to the rear toward them and landed on the hard but somewhat loosely gravel road. The open door and a hump in the road partially obstructed their view. The Martin automobile was traveling about 10 to 15 miles per hour. The car of witnesses Scroggs and McConnell was about 150 feet behind it. They speeded up and were at the scence in a few seconds.

Shaw's head apparently struck the road first, the face and body settling on the right front side angling to the northeast, with right arm underneath, left arm in bowed position, body and legs slightly curved or doubled up. There were three or four slight reflexive movements of the stomach muscles after these two witnesses arrived but no pulse. A pool of blood soon gathered under the head. For about 12 feet on the road there were skid or tire marks made by the Martin car, and the body lay 5 to 8 feet laterally therefrom and about even with the back part. Scroggs on a guess estimated the car stopped about 20 feet north of the barn yard gate of a Mr. Slawson; McConnell ventured the distance was 60 feet. The Martins alighted from the front seat of their automobile. Marvin Martin was on the driver's side. They were not drunk but both were excited and nervous, the appellant particularly.

Appellant suggested calling a doctor or ambulance. He and the son said Shaw suddenly had exclaimed "Let me out, let me out," and

before they could do anything "he just jumped out." Witness Scroggs went to a neighboring house to telephone for help, and McConnell suggested that the Martins drive their car ahead so McConnell could get his car between it and the body. This was done, the Martin car moving forward, 15 or 20 feet which put it even with or 40 feet north of the Slawson gate, gauged by the previous divergent approximations of witnesses Scroggs and McConnell as to the position of the Martin car when it first stopped. McConnell then drove his own car south to the nearby hospital of Dr. Cowan and summoned the doctor. A crowd soon gathered, and several witnesses noticed that there was a fresh bleeding place on appellant's right hand first finger knuckle. He was frequently putting it to his mouth, and told Richard Shaw, son of the deceased he must have received the injury in opening the car door. His later explanation to Sergeant Veits of the State Highway Patrol was that he got it while at his sheep barn *after Shaw's death*.

The next morning, Sunday, a fifteen year old boy named Giles Holman, who lived at Dr. Cowan's hospital, was at the scene of the casualty and found an iron bar about 14 inches long and 3/4 inch in diameter. One end was threaded for about 2-1/2 inches, and that end was sticking in the soft, fresh ground for that distance and leaning against the Slawson barn lot fence something over eight feet diagonally southwest from where he had seen the front of the Martin car standing the day before in front of Mr. Slawson's gate, just after Shaw's death. Flaked pieces or rust scales were knocked off the bottom of the bar, and higher up there were fresh scratches on it. Sergeant Veits examined the tools in the Martin car and found a jack (used in changing tires) without a handle. The hole in the jack designed for insertion of a handle, was tapered and about 3 inches deep. The lower part of the iron bar found by young Holman would fit in the hole, and that was the part from which the rust scales had been knocked off (as by use in the jack). The Martins denied ever having or using the bar, and Mr. Slawson said it looked like one that had been kicked around his barn lot for two years. He thought, but was not sure, it was the same bar.

Also, about 30 minutes after the casualty the last mentioned witness, Slawson, found a half-full bottle of whiskey lying flat on the ground in his barn lot 20 feet or so inside the fence and southwest of where Shaw's body had been lying in the road. He had never found any half-full bottles there before or since. He asked Emerson Scott, who knew about it, not to say anything, but gave it to the sheriff two days later, when requested. The bottle was produced and identified at the trial, and Richard Shaw, son of the deceased, swore in his best judgment it was the one from which the appellant had given him a drink about 1:30 in the afternoon on the date of his father's death.

The testimony of several witnesses was that there were no bruised or skinned places on the hands of the corpse. The face, hair and clothing were clean except the parts lying in contact with the road. There was a bruise on one knee and also some bruises and contusions on the right cheek that lay on the gravel road. But an autopsy by Dr. Cowan, at which undertaker Ward was present, disclosed that the scalp had been loosened from the cranium and the bone covering, or periostium, was torn loose from the skull in fan shape extending down from about 2 or 3 inches above the left ear. There was a small cut place at the top of this area. An extensive fracture of the skull was found, reaching down the nose. · And the force of the blow from some blunt instrument had traveled downward causing a basal fracture at the juncture of the skull and spinal column, causing a severance of the spinal cord and producing almost instant death. Dr. Cowan said this result could have been produced by a blow from the iron bar. In other words, the violence had been downward to the *left* side of the head, not to the *right* side which lay on the road. Dr. Drisdoll, testifying for the defense, made an examination two days after death. He found the injuries about the same, but expressed the opinion that these results could have been produced by the body's falling on the hard road as already outlined.

We shall not attempt to detail the further evidence for appellant. ·There was plenty of testimony, if believed, that Shaw had agreed as early as June 30 to go with appellant to Ft. Leonard Wood to get government work; and that he had made a provisional arrangement the night before the homicide to start on the following Sunday. To the contrary, there was evidence for the State that Shaw had in immediate contemplation certain farm projects at home which would require his personal attention. There were also the explicit denials of guilt by appellant and his son, and the lack of direct evidence of the homicidal act. But without extending the opinion, we can only say the case made by the State was for the jury. The rule invoked by appellant may be readily conceded; that in criminal cases the State's prima facie showing must be sufficiently substantial to warrant a jury of reasonable men in finding the defendant guilty *beyond a reasonable doubt*. Not long ago we re-examined that question at length in State v. Gregory, 339 Mo. 133, 141-143, 96 S. W. (2d) 47, 51-52. But we think the evidence here measures up to that standard.

██ Appellant also complains of the admission in evidence of the iron bar and whiskey bottle, contending there was no evidence connecting them with appellant. We think the evidence as to the bottle is stronger than that concerning the bar. But the facts indicate: the bar might have been used in the tire jack in the car in which the parties were riding; it was found sticking in fresh ground at the scene of the crime in such a position that it might have been placed there recently by someone; it appears that witnesses Scroggs and Mc-

Connell were absent from the scene of the homicide for a brief period, the one telephoning and the other going to the Cowan hospital, during which the defendants might have deposited the bar and thrown the bottle where they were found; there were evidences that the bar had been recently handled; and it was the kind of instrument that probably was employed in the homicide. We think the evidence was competent. A reading of State v. Richards, 334 Mo. 485, 492(1), 67 S. W. (2d) 58, 60(1), cited by appellant will disclose that the facts there were wholly different. The rule stated in 16 C. J., sec. 1225, p. 619, is as follows:

"While it is sometimes held that weapons or cartridges which are not shown to have been in the possession of accused are not admissible in evidence, a weapon with which the crime might have been committed, taken in connection with evidence of its finding near the time and scene of the crime, is a relevant evidentiary fact tending to show the means by which the crime was committed; and in such a case it is not necessary to connect the weapon with accused in order to render it admissible in evidence."

■ Error is assigned in the giving of the State's instructions No's. 2, 3 and 6. Instruction No. 6 was on accidental homicide. Instructions 2 and 3 were on murder in the first and second degree, respectively. Each of the latter concluded with a direction that if the jury found the facts as stated in the instruction they should convict; and that unless they so found the facts they should acquit, or unless they found from the evidence that Shaw met his death by accident as explained in instruction No. 6. Appellant does not contend an instruction on accidental homicide should not have been given. He merely asserts that instruction No. 6 *unduly* directed the jury's attention to that defense. He makes the same complaint of instructions 2 and 3 because they *refer* to instruction No. 6. He does not mention these contentions in the argument in his brief. We find nothing subject to the slightest ■ criticism in the form of instruction No. 6; and therefore are unable to see any merit in his objections to the other two instructions because they refer to it. The instruction was as follows:

"The Court instructs the jury that the defense in this case is that Alva Shaw came to his death by accident, and the court further instructs the jury that it is their duty to properly weigh and consider this defense, and, if there is a reasonable doubt as to whether or not Alva Shaw came to his death by accident, it is the duty of the jury to give the defendants the benefit of such doubt and find them not guilty.

"The burden of proof is not on the defendants to show that Alva Shaw came to his death by accident, but the burden of proof is on the State to show by credible evidence beyond a reasonable doubt that Alva Shaw did not come to his death by accident.

"The Court instructs the jury that by the term 'accident' is meant 'an event that takes place without one's foresight or expectation; an undesigned, sudden, and unexpected event.' 'An undesigned and unforeseen occurrence of an afflictive or unfortunate character; a mishap resulting in injury to a person or damage to a thing; a casualty; as, to die by an *accident*.'"

■ Appellant also contends that said instructions No's. 2, 3 and 6 conflict with his given instruction D. The latter in substance declared the mere fact that Shaw came suddenly to his death would not justify a conviction; that the burden was on the State to prove beyond a reasonable doubt the death was caused by violence of the defendants; and that in default of such proof the jury were bound to presume some other cause whether the evidence showed it or not. We have recently held it is incumbent on the trial court to instruct on accidental homicide as a part of the law of the case, whether requested or not, if there is evidence supporting that theory. [State v. Crowley, 345 Mo. 1177, 1182(I), 139 S. W. (2d) 473, 475(1).] Appellant has made no effort to point out wherein instruction D conflicted with the State's instruction No. 6. This being true, his assignment on that ground must be ignored. [State v. Reagan (Mo. Div. 2), 108 S. W. (2d) 391, 396(7); State v. Kaner, 338 Mo. 972, 977(4), 93 S. W. (2d) 671, 674(8).]

■ The 10th and 11th assignments of error in appellant's brief charge that during the trial the jury separated and communicated with third persons; and that while they were deliberating they resorted to information outside the record and used such information as an argument for conviction, some of the latter being coercive to a verdict of conviction. As a part of said Assignments of Error, appellant sets out evidence presented to the trial court during the hearing on his verified motion for new trial, bearing on the above assignments. But he does not mention it or cite authorities in his Brief and Argument. This is not intended as a criticism of his counsel. We take it only as a tacit concession of the weakness of the evidence. The evidence showed the deputy sheriff kept the jury together during the trial and during their deliberations. They went to a barber shop once but he was with them. On that occasion one of the jurors 30 or 40 feet outside of the barber shop door called out to his son across the street, and inquired if he had got any mail. But the sheriff was in touch near enough to hear it.

The evidence also showed the jury's sleeping quarters were upstairs in the hotel, two in each of six rooms, with the deputy sheriff in the seventh room. The rooms were all around the hall but not connected. The deputy sheriff could see some of the jurors but not all of them, and said he probably slept some. He also said he thought "there was someone else up there, but I never seen anybody while we was up there on that—." The trial court was in a better position to

interpret this language than we are. We think State v. Shawley, 334 Mo. 352, 379(4), 67 S. W. (2d) 74, 88 (29-33), disposes of appellant's contentions. We find no evidence at all supporting assignment 11 that the jurors received and used information outside the record and argued coercively thereon—except that they conversed and read newspapers and "things of that kind, right along, in the hotel office before they retired." Relative to these matters see State v. McGee, 336 Mo. 1082, 1091(2), 83 S. W. (2d) 98, 103-4 (5, 7).

█ Finally, error is assigned on the trial court's refusal to grant a new trial because of newly discovered evidence. The affidavits of two witnesses were produced that immediately following the coroner's inquest over the body of Shaw, they talked to Dr. Cowan, the State's medical witness; and that he did not say Shaw had █ suffered a *basal* fracture, and also expressed the opinion that Shaw's neck had been broken by a lick with a club or some heavy weapon across the back and side of the neck. At the trial Dr. Cowan said the force of the blow must have come from *above*. But there was very little difference between him and Dr. Drisdoll, the appellant's medical witness, concerning the nature of the injuries, and both agreed the cause was a blow with a blunt instrument. We see no substantial difference in the expert view of both that the force must have come from above, except that Dr. Drisdoll thought the fracture could have resulted from the head moving *up* or against a metal moulding above the door of the Martin automobile, or against the hard road when Shaw's body catapulted from the car. In other words it was only a question whether the head met the force or the force the head. It was not the trial theory of either side that Shaw had been struck in the neck and there was no physical evidence of it. We do not regard the alleged impeaching evidence as of enough importance to call for a new trial. We hold the trial court did not abuse its discretion. [See State v. Payne, 331 Mo. 996, 1005(7), 56 S. W. (2d) 116, 119(9).] Perhaps the evidence here would not have been cumulative, but.it was of slight· importance.

We find no reversible error, and therefore affirm the judgment. All concur.