THE STATE v. GRANVILLE ALLEN, Appellant.—119 S. W. (2d) 304.

Division Two, August 17, 1938.

*Al. N. Abrams* and *Geo. H. Jones* for appellant.

*Roy McKittrick,* Attorney General, and *Frank W. Hayes,* Assistant Attorney General, for respondent.

LEEDY, P. J.—Granville Allen, the appellant, was charged by indictment in the Circuit Court of Jackson County with murder in the first degree, in having shot and killed one Howard Preston on October 20, 1936. Upon a trial, he was convicted, and from the judgment and sentence imposing the extreme penalty, in accordance with the verdict of the jury, he has prosecuted this appeal.

The points urged for reversal are only two, i. e., a challenge of the sufficiency of the evidence, and the contention that the verdict "was the result of passion, bias, prejudice and partiality." Looking to the first of these assignments, we find that there is no dispute as to most of the main facts in the case. That deceased met his death while in a struggle with appellant, a burglar in the Preston apartment, is not controverted. Appellant's contention with respect to the sufficiency of the evidence is limited to the single proposition that there was no substantial evidence that he fired the fatal shot.

Howard Preston, the deceased, was a white man, and at the time of his death was forty-seven years of age. He lived in the Northeast section of Kansas City in a four-room apartment located at 1010 Chestnut Street. The household consisted of himself, his wife, their son, Bud, and the latter's wife. The family had retired on the night of October 19, 1936, the elder Prestons sleeping on an in-a-door bed in the dining room, and the son and daughter-in-law occupied the bedroom. The widow of deceased, testifying on behalf of the State, clearly developed the facts in relation to the homicide. From her testimony it appears that sometime after midnight, she was awakened by voices in the room, one of which she recognized as that of her husband. When she started to get up, her husband said, "Lay down mother; he will kill you." At that time an intruder (admittedly appellant) said, "Yes, this is a hold-up. You better lay down, and not start screaming, or I will kill you." He searched Mr. Preston's trousers, and demanded money—"He kept asking for money—wanted more money. And we told him we didn't have any more. He said we did have more. And he just kept saying he was going to kill us, he was going to kill us, and kept flashing that gun around first at our shoulder and then stepping back."

He asked Mrs. Preston where her pocketbook was, and was told it was in a drawer, but wasn't much in it. "He walked around there, and took his flashlight and gun in one hand and held that on us and went to the drawer. He didn't find any more, and he went back again and still didn't find any. We said we didn't have any, and he said well if we didn't have any money for him he would kill us and go." According to the further testimony of Mrs. Preston, he then "put the gun on us again" and demanded that she and Mr. Preston have sexual intercourse, and said that thereafter he would kill Mr. Preston and have intercourse with her. Whereupon Mrs. Preston arose and ran into the bedroom screaming for her son. She aroused her son, and his wife, and, grabbing a stick of wood, followed her son back toward the dining room. Appellant, with gun and flashlight, was coming toward that door, and Mrs. Preston "hit him with the stick of wood over my son's shoulder." Whereupon, Bud, the son, jerked her back into the kitchen, and shut the door, and was holding the door, and in a few seconds after that a shot was heard. Bud remarked, "My God, Mother, I can't stand this" and so he "pulled the door open and ran in there." Mrs. Preston "ran out the back way, . . . and started screaming out there, and I couldn't get anybody, so I came back into the room and I saw Mr. Preston laying on the bed covered with blood and bleeding." She got as far as the foot of the bed and noticed her son was down on the floor, and that appellant was sitting on top of him. She "reached back and grabbed some beer mugs, and rushed over and started beating him (appellant) on the head. I beat until there wasn't anything left in my hands but the handles . . . Then he (appellant) reached up and grabbed me under the arms and swung me over by the table. I didn't know where the gun was. . . . And I heard a shot and felt his (appellant's) body slump—he still had me—and my son commenced to hit him in the face with his fist and knocked him away from me, and I dropped back against the bed." Mrs. Preston then ran out the door to the neighbors to call an ambulance, and when she "came back in the room and was standing by the table and just as he (appellant) was getting off the floor and trying to make it for the window, and he knocks me off my feet and goes through the window—shade and pane and all." Mrs. Preston's son and daughter-in-law were called as witnesses on the part of the State, and their testimony corroborated her as to the circumstances under which deceased was shot and killed. The son testified at length as to the struggle between his father and appellant following the shot which he and his mother heard after the latter had struck appellant with the stick of wood. He also testified to his own encounter with appellant, in which chairs were broken, and the bed was torn down, and the trigger of appellant's pistol was

snapped on his, Bud Preston's, hand. The son testified, without objection, that while his father "was on his hands and knees at the foot of the bed—the standard was knocked our from under the bed . . . he said, "Son, he has killed your dad."

Appellant was apprehended almost immediately following the shooting. He was seen to leap from the window in the Preston apartment, and he was followed to a nearby alley where he had fallen wounded. He was taken at once to the hospital, where he was searched, and deceased's keys found in one of his pockets. In this connection it may be said that appellant expressly admitted ownership of the gun with which deceased was killed, and with which he himself had been shot by Bud Preston. On November 8, while he was still in the hospital, appellant made a written statement, which was introduced in evidence at the trial. The facts as detailed therein, as to the homicide itself, were substantially in accord with his testimony at the trial.

Appellant is a young colored man. On the stand he admitted a previous conviction for burglary, and that he had served a term "at Boonville" therefor. He testified that on the night in question he had been drinking to some extent; that at a late hour he left his home "and I goes on out Northeast" with a pistol and a bottle of liquor; that he finally ran out of whiskey, and threw the bottle away and started back home, and had reached the vicinity of Tenth and Chestnut Streets. From that point on, his version of the affair, as related on his own direct examination, is as follows:

"A. After I got to that vicinity I was walking down the street and happened to see a light in an apartment window and I walked up to the light and looked in the window. I see a pair of pants on the table, so I figured there might be something in the pants, so I goes on back and looks and sees the window was up. I gets in the window and walks over to the table. After I goes to the table, there was a man in the bed, and I turned around and saw the man sitting up in bed. I stands up and he asked what I was doing. I told him, I say 'I just want your money. I ain't going to bother you.' I turned around and looked at the pants and his wife woke up. I told her to lay down because I wasn't going to bother. I goes looking in the pants and I turned around and saw there was nobody in bed but him—the lady had gone. So I goes to the door. I see where the door opens and I takes out the gun and goes to the door. As I goes to the door—Well, at that time they come to the door.

"Q. Who came to the door? A. A boy and two women came to the door. And I gets up close before they come and by the time I got to the door somebody hit me on the head with something—I don't know what it was. I fell toward the door and the door closed. That is the last I can remember.

"Q. Is that all you remember? A. I remember somebody jumping on me, but no more.

"Q. When is the next time you came to? A. When I came to I was in the hospital the next day."

The foregoing sufficiently outlines the facts to determine the point urged by appellant as to the sufficiency of the evidence. It is perfectly true, as he asserts, that the three Prestons who testified on the part of the State, were not in the room at the time of, and did not see the firing of the fatal shot. However, it does not follow that for this reason, as appellant contends, the verdict rests on speculation and guesswork alone. The declaration of the elder Preston, being a part of the res gestae, is of itself a complete answer to the contention. Furthermore, in passing on the sufficiency of the evidence to sustain a conviction, even in cases where it is entirely circumstantial, the rule is that the State's substantial testimony tending to implicate accused should be taken as true, and every legitimate inference which may reasonably be drawn from it should be indulged. [State v. Henke, 313 Mo. 615, 285 S. W. 392; State v. Smith, 329 Mo. 272, 44 S. W. (2d) 45.] Under this formula, it is idle to say the demurrer to the evidence should have been sustained.

 There is nothing in the point that the verdict is the result of passion, bias, prejudice and partiality. The argument is made "that the jury's mind was ruled by passion and prejudice against this defendant because of the illegal question of rape put in evidence by the state." The testimony of Mrs. Preston in relation to her threatened ravishment was heard without objection. It has not been suggested upon what ground this evidence might have been lawfully excluded. It was clearly a part of the res gestae, and admissible as such. Its weight and value were for the jury.

 Aside from the admitted fact that appellant and most of his witnesses were Negroes, and deceased was a white man, the only other matter urged under this head is that the prosecuting attorney's closing argument was inflammatory and highly prejudicial in that he referred to appellant as "a would-be rapist." The record does not sustain the assignment. If the prosecutor did use the language complained of, there is no hint of it in the record. Indeed, no objections to any part of the argument are preserved. We have repeatedly held that assignments of this nature do not prove themselves. The contention is accordingly overruled.

 Upon a careful examination of the whole record, we are of the opinion that appellant was accorded a fair and impartial trial. In fact, the record unmistakably reflects an attitude and disposition on the part of the learned trial judge to scrupulously safeguard and enforce every right vouchsafed appellant under the law. It follows, therefore, that the conviction should stand. But the judg-

ment provides for the execution of the sentence by hanging, in accordance with the statute in force at the time of its rendition. [Secs. 3722, 3723, R. S. 1929; secs. 3722, 3723, Mo. Stat. Ann., p. 3268.] But a new act, now in force (Laws, 1937, pp. 221, 223), provides that the death sentence shall be executed by the administration of lethal gas within the walls of the State penitentiary. This is the same situation with which we dealt in State v. Brown, 342 Mo. 53, 112 S. W. (2d) 568 (and later cases), and in accordance with the practice there adopted, we affirm the judgment, but order the cause remanded to the trial court with directions to cause appellant to be brought before it, and to pronounce sentence in accordance with Laws, 1937, pages 221, 223.

All concur.