STATE v. THOMAS M. HUFF, Appellant.—No. 38949.—184 S. W. (2d) 447.

Division Two, January 2, 1945.

*W. B. Duncan* for appellant.

*Roy McKittrick*, Attorney General, and *B. Richards Creech*, Assistant Attorney General, for respondent.

LEEDY, P. J.—Defendant and Fred Holzhauer were jointly charged in the DeKalb Circuit Court with a violation of Sec. 4458 R. S. '39, in having stolen chickens in the nighttime from the messuage of another. A severance was granted, and upon his separate trial, defendant was convicted, and sentenced to imprisonment in the penitentiary for a term of three years, and he appeals.

The offense is alleged to have occurred on or about May 27, 1943. Mrs. Dan Gibson, from whom the chickens were alleged to have been stolen, is a widow, and operates a filling station on U. S. Highway 36 about two miles west of Stewartsville in DeKalb County. The station is located at the southeast corner of the Gibson farm, which farm is operated by her son, Harry. Mrs. Gibson owned some 200 chickens. They were of different breeds and colors—red, yellow and white. She kept them on her home premises in two brooder houses—approximately 150 in one, and 50 in the other. The chickens went to roost in their respective brooder houses the night of May 26, and, as was her custom, Mrs. Gibson shut them up by placing a board against the door. The next morning there were only five or six chickens remaining in the smaller brooder in which forty-five or fifty had been placed the night before. She had not discovered her loss until inquiry was made the next morning by Bert Cornelius concerning the matter.

The Bert Cornelius family resides two miles north of the Gibson station on an east and west road paralleling Highway 36. Their house is located on the south side of said road, and faces north. It is some seventy-five feet from the road. Across the road and slightly west of the residence they have a brooder house. It was kept lighted at night. About 12 o'clock on the night in question, Mrs. Cornelius was disturbed by the barking and actions of their two dogs. She stationed herself at an upstairs window where she could watch the brooder house across the road, but saw nothing. She heard noises which indicated someone was walking through the grass in the yard. Presently she heard a window raise. She went to investigate, and heard a car door slam, and a car start. She aroused her husband and their 18-year-old son, Lee, both of whom got up instantly, and prepared to give pursuit. The car which she heard proceeded east, slowly at first, passed the house, momentarily came to a stop ("like they might be waiting for someone"), when Bert Cornelius "hollered 'halt,' and they turned on their lights and tore off." Thus started a lively and extended chase, a few of the details of which will be noticed. When awakened by his wife, Bert Cornelius did not take time to dress, nor even to put on his shoes and stockings. He was sleeping

in one of his "old Sunday shirts." He was quite positive that he was downstairs and out in the yard with the rifle within thirty seconds from the time he "rolled out of bed" in his Sunday shirt. It appears that this garment was the sole raiment worn by him during the chase. Bert Cornelius discovered the rifle was not loaded and he abandoned it, and took up a shotgun. Meanwhile Lee had gotten their car out of the garage. By this time the ▇▇▇ fleeing car, proceeded east, had gotten a start. The Corneliuses followed, Lee driving. When the first road leading south to the highway was reached, the fleeing car·was not in sight. Cornelius and his son looked south down· that road, and saw no lights, and so continued east a half mile until they reached the second crossroad, then turned south on it, proceeded to the highway, then turned west on the highway. When they neared the intersection of the highway and the first crossroad above-mentioned, they saw a car approaching the highway from the north. In order to intercept it, the Cornelius car was turned north off the highway and on to the side road. The car approaching from the north stopped and turned off its lights. The Cornelius car stopped about sixty feet north of the intersection, and the other car was about fifty feet farther north. Bert Cornelius jumped out, and armed with his shot-gun, stepped into the light thrown by the two cars, and commanded the occupants of the other car to "pile out, and put 'em up." In response to that command, a man opened the car door, and stood on the running board with his hands up. Bert Cornelius then said, "Come on, the rest of you, and come out." Instead the driver "gunned the car in low, and put on all the gas it had." The car thus succeeded in getting by, and to the highway, but only after it had been fired on by Cornelius. Meanwhile, the man on the running board disappeared. Whether he fell into the grader ditch, or had actually gotten back into the car, the witnesses were, at the time, uncertain. In any event, the car turned east on the highway, and the Cornelius car was backed up to the highway, and the chase was resumed. It continued for several miles, first on the highway, then on side roads, and in and out of the town of Stewartsville. The fleeing car lost a tire and proceeded a very considerable distance on the rim. The Corneliuses lost track of it in Stewartsville. After "waking up the town," they heard a car running on the rim on a gravel road near the cemetery. Proceeding to that locality, the car which had been pursued was found abandoned, with one tire off, and "the front wheels astraddle of the grader ditch, and it was hot." It was a 1935 Oldsmobile. There were six or seven yellow or buff chickens around the car, some in the grader ditch, and others on the other side of the road by the fence in the weeds. There were chicken feathers in the car, on the seats and on the floor, and also in the trunk. There was no farm house or chicken house in the immediate vicinity. The

chickens were caught, and taken to the Powell poultry house, and put in a separate coop.

The highway, both east and west, was patrolled by at least two cars in search of the offenders. These cars drove nearly into St. Joseph. On one of the return trips, and at a point near San Antonio, a man was seen walking west on the highway toward St. Joseph. It was just beginning to get daylight. The driver of the car turned on the lights, and as he did so the pedestrian ran off of the highway, and "ducked into the grader ditch," and undertook to conceal himself. The car was stopped, and the man (defendant herein) was taken into custody. He was questioned. He stated (after first declining to say where he was going) that he was on his way to St. Joseph, and that his car was wrecked over in the vicinity of Stewartsville. He was then taken to St. Joseph, and to the police station and turned over to the officers.

State Highway Patrolman Inman testified that on the next morning he was at the police station in St. Joseph when the defendant and Holzhauer were being questioned; that defendant requested that he be permitted to talk with the witness alone; that he and the defendant went into the cellblock and Inman said, "Now, Tommy, I will be glad to talk to you, but I don't want you to tell me anything but the truth, if you want to tell me the truth, I will be glad to talk to you." We quote Inman's testimony as follows:

"He said, 'Fred Holzhauer and I was out, started out to Stewartsville to see a girl, and we had some wine, been drinking, and we got out near Stewartsville Fred said, "let's steal some chickens,"' and Tommy said, that is, he said, 'do you think we can get by with it, and Fred says why it is easy, the farmers go to bed at nine o'clock out here' so he said all right. He said they stopped at three places, that Fred got out of the car and went in to the chicken house at two places. Tommy said he never did go over the fence, and never went into the chicken house, but he got out of the car, and helped put the chickens in the car, and I said, 'well, why didn't you want to tell me that in there before these other men?' and he said a big farmer in there with a grin on his face and he said he didn't want him to know what he was doing out around Stewartsville."

The witness Pickett testified he came by the cemetery about eight o'clock the next morning and saw the car near the cemetery in the ditch. He stopped to investigate and found two sacks of chickens over the fence from the car. He did not open the sacks, but he knew they were chickens because of the squawking. He took these sacks of chickens to the Powell poultry house and left them.

Harry Gibson went to the Powell poultry house about nine o'clock and identified the chickens as belonging to his mother. They were red, yellow and white chickens. Later in the day Mrs. Dan Gibson went to the poultry house and identified the chickens as hers. She recognized

particularly four roosters, which were all the roosters she had in the small brooder house. She and her son took the chickens home and let them out in the yard in the evening. All of the chickens went in the small brooder house to roost, except two roosters which did not belong to her. There were nineteen chickens taken to the Powell poultry house, two of which were dead.

The defense was this: Mrs. Opal Boyer, a resident of Stewartsville, testified that defendant and Holzhauer came to her home about nine o'clock on the night in question; that Holzhauer let the defendant out of his (Holzhauer's) car at her house, and then drove on; that defendant remained at her house until after midnight; that Holzhauer was supposed to return for defendant, but did not do so; that defendant left her house "close to midnight." She further testified that at about two o'clock in the morning Holzhauer came to her home, and told her that he had either wrecked his car or that it was broken down, and that he had no way to return to St. Joseph, and asked if he could stay there the rest of the night, and that he was allowed to do so. The officers came later in the night and arrested Holzhauer at her home.

The defendant in his own behalf testified that he was 45 years of age, married, had one child, and resided in the City of St. Joseph where he was employed in a garage; that he and Holzhauer left St. Joseph about eight o'clock on the night in question and drove to Mrs. Boyer's home in Holzhauer's car; that Holzhauer had half a gallon of wine in his car, and that they drank some of it out of the jug; that they drove up in front of the Boyer house and he (defendant) got out of the car at about nine o'clock; that their arrangement was that Holzhauer would return for him about eleven o'clock. Defendant testified that at midnight, when Holzhauer had not returned for him, as agreed, he started to walk to St. Joseph; that a point about a half a mile from the Boyer home, as he was walking west on the highway, he was overtaken by Holzhauer, who was in the same automobile in which they had come out to Stewartsville; that Holzhauer was "very drunk" at the time; that he got into the car, and Holzhauer was driving; that they proceeded west about a half a mile when Holzhauer turned north off of the highway, and on to a rough road; that Holzhauer got "turned around, and did not know where he was"; that they finally pulled up by a house, and Holzhauer said, "I know where I am at now; that is Bert Cornelius' place"; that "they drove on by the house a little ways and stopped and took a drink out of his jug"; that Holzhauer "seemingly circled around out in there" until they saw the lights of a car traveling on Highway 36, when defendant told Holzhauer, "This is where you turned off the road. If you turn right, you go to St. Joseph." When they reached the highway intersection, the events related by the Corneliuses transpired. Defendant admitted that in response to the command to

"come out of there with your hands up," he opened the car door, stuck up his hands, and stepped out; that at that moment, Cornelius fired, and Holzhauer "took off in the car," and he (defendant) jumped into a ditch. The last he saw of Holzhauer was when the other car was chasing him down the highway. Defendant testified that he then "started afoot on the road into St. Joe," and was later taken into custody at the place mentioned by the state's witnesses. His explanation for his attempt to conceal himself in the ditch was that as the car approached him he saw "a gun pushed out the door," and for that reason he "dived for the ditch." He denied he had stolen any chickens, or that there were any chickens in Holzhauer's car, and he denied making the statement attributed to him by the highway patrolman.

The four principal propositions relied on for reversal are: (1) That the state did not make a submissible case; (2) The refusal of the trial court to permit defendant to cross-examine one of his own witnesses, the Sheriff; (3) Alleged error in the giving of instructions IV and VI.

We regard it as too plain for argument, and to require no discussion, that from the facts hereinabove outlined, the state made a case for the jury, and that the verdict is supported by evidence of the most substantial and convincing character.

The motion for new trial does not assign error in relation to the refusal of the court to permit defendant to cross-examine his own witness, the Sheriff, concerning the latter's testimony at the preliminary, and for that reason the matter, urged for the first time on appeal, is not open to review.

The complaint with respect to Instruction IV is that in the portion thereof which required the jury to find that the taking was with a felonious intent, the word "fraudulently," among others, was used, the exact phraseology being "unlawfully, feloniously, and fraudulently." The inclusion of the word "fraudulently" is said to render the instruction reversibly erroneous because "it permits a verdict of guilty by the jury for fraud, which is not an element of stealing chickens in the nighttime." The offense with which defendant was charged is, by Sec. 4458, declared to be grand larceny. And in larceny cases the use of the word "felonious" or feloniously is not necessary in instructions defining the intent with which the taking is accomplished if synonymous words are used. We have said, "This intent may be aptly defined by terms indicating the wrongful and fraudulent, or criminal nature of the taking, coupled with words charging the taking as being without the owner's consent and with the fraudulent intent to convert the property to the use of the taker and to deprive the owner thereof permanently." State v. Rader, 262 Mo. 117, 171 S. W. 46; State v. Tipton, 307 Mo. 500, 271 S. W. 55; State v. Price, 348 Mo. 361, 153 S. W. (2d) 353.

This brings us to a consideration of the one serious question in the case: That in relation to Instruction VI on circumstantial evidence given at the instance of the state. It is true that the principal facts relied on, aside from the proof of defendant's admissions, were circumstantial. But, as proof of an admission of guilt is to be treated as in the nature of direct evidence thereof, the refusal of an instruction on circumstantial evidence would have been justified. State v. Criger (Mo.), 46 S. W. (2d) 537; State v. Crawford (Mo.), 289 S. W. 961. Nevertheless, the rule is that where, as at bar, a case partially depends on circumstantial evidence, it is proper, but not mandatory, to instruct thereon. State v. Arnett, 338 Mo. 907, 92 S. W. (2d) 897. It was doubtless on this theory that an instruction on circumstantial evidence was given at all. The challenged instruction reads as follows:

"The Court instructs the jury that it is not necessary to prove the defendant guilty by testimony of witnesses who may have seen the offense committed, if you find that the offense of larceny, (being the offense charged) was so committed by the defendant, but such guilt of the defendant may be established by proof of facts and circumstances from which the defendants guilt may be reasonably and satisfactorily inferred."

This form of instruction was expressly condemned by the Kansas City Court of Appeals in State v. Gray, 163 Mo. App. 696, 147 S. W. 510, as omitting the essential elements necessary to make circumstantial evidence sufficient foundation for a conviction. Our own cases are in accord. "An instruction on circumstantial evidence should, *in substance*, advise the jury that 'the circumstances must be consistent with each other and with the hypothesis that the defendant is guilty, and inconsistent with the theory of his innocence and with every reasonable hypothesis, except that of guilt.'" State v. Conway, 348 Mo. 580, 154 S. W. (2d) 128, and cases cited. See, also, State v. Hubbard, 351 Mo. 143, 171 S. W. (2d) 701. This the challenged instruction utterly fails to do. In the Gray case, supra, it was contended that the foregoing rule is only applicable where all the evidence is circumstantial. This was held to be erroneous, the court saying, "That is a mistake. The ruling of the Supreme Court is that it is not necessary to give an instruction on circumstantial evidence at all unless that character of evidence alone is relied upon for conviction. [State v. Crone, 209 Mo. 316.] But though not necessary that the court give such instruction, yet if the court does give one, 'it should cover the subject fully, and give such an instruction as has frequently met with approval by this court.' [State v. Salmon, 216 Mo. 466, 529.]"

The judgment is reversed and the cause remanded. All concur.