STATE OF MISSOURI, Respondent, v. LEONARD MARION BAYLESS, Appellant, No. 42314—240 S. W. (2d) 114.

Division One, May 14, 1951.

Motion for Rehearing or to Transfer to Banc Overruled, June 11, 1951.

110

*Frank E. Mathews* for appellant.

*J. E. Taylor,* Attorney General, and *David Donnelly,* Assistant Attorney General, for respondent.

112

█ DALTON, J.—Defendant was charged with murder in the first degree, but was convicted of murder in the second degree and sentenced to a term of 50 years in the state penitentiary. He has appealed.

The indictment charged an assault upon Gladys Taylor Hallenbach Crossley, in the city of St. Louis, on June 11, 1948, resulting in her death on June 12, 1948. Her body was found in Tower Grove park in the city of St. Louis, about 9 a.m., Saturday. June 12, 1948. It was found 75 feet north of Arsenal avenue and some 60 feet west of the west curbline of Spring avenue extended. Death had occurred between 6 p.m., June 11, and 6 a.m., June 12, and had been caused by the application of force, blows to the body, external hemorrhage, suffocation by choking, and by shock. There were scratch marks and contusions on deceased's neck, a laceration of the right temporal artery, fractures of the upper and lower jaw bones and of the nose. Two of her upper teeth had been knocked out, her head, face, eyes and right shoulder bruised, her lips cut and there was "aspirated blood in both lungs." "She could have received. these wounds (the traumas and fractures) by kicking." The body was clothed in a black dress with a wide leather belt and there was a lady's large, open crown, black straw hat under her head. Sometime subsequent to the finding of the body, deceased's black purse was found in Tower Grove park about 30 or 40 feet from Roger's place and deceased's wallet was found at the intersection of Oak Hill and Arsenal streets. Roger's place is the second street west of Spring avenue and Oak Hill is the third street west.

Appellant, 21 years of age, was employed near Fred's Cafe, 213 Lucas street, in the city of St. Louis. He had been frequenting the cafe after work for several days prior to June 11, 1948, and deceased,

a divorcee about 41 or 42 years of age, had been employed at the cafe during approximately the same period. Appellant came to the cafe about 5 p.m., June 11, 1948, and had two beers with men companions. Deceased, off duty, came to the cafe about 5:20 p.m. and sat at the bar visiting with some taxicab drivers, when appellant sent word that he wanted to talk to her. He advised one of his companions that he wanted to take her out and wanted to get into her pants. Presently, she came and sat by appellant and they, thereafter, had some five beers each (5% beer). Appellant then made a phone call and he and the deceased left the cafe together, by a side door, some time between 7 and 8:30 p.m., and "went west."

At the cafe, deceased was dressed in a black dress with a wide black belt and she wore a "picture hat", a large black straw with open crown and a small blue flower. She wore black slippers, long light blue gloves and carried a large patent leather purse with a strap over her shoulder. She was "dressed up", while appellant wore a "pretty dirty" and "soiled" white shirt with his sleeves rolled up to his elbows and his shirt collar was open. He wore "soiled" tan or gray trousers. There was also evidence his trousers were dark. He was round shouldered and his hair was long, black and shaggy looking, and extended down to the lower part of his neck.

After leaving Fred's Cafe, appellant and deceased were next seen on a Page avenue bus, going west on Washington avenue, between 9 and 9:30 p.m. They were on the bus before it crossed Broadway. Both smelled of alcohol and "she was sort of laying on his shoulder like." Appellant then wore tan or dark pants. Appellant and deceased alighted from the bus at Grand and Washington avenues at about 9:45 p.m.

Appellant and deceased were next seen riding a southbound Grand avenue street car, they were on the car when witness Clark boarded the car at Grand and Olive at 10 p.m. Deceased was either asleep or intoxicated and would lean down across the appellant almost to his lap. The couple was still on the street car at Grand and Market. There was also evidence that appellant and deceased boarded a southbound Grand avenue street car at Grand and Easton avenue, about 11 o'clock or a little after. The car was loaded and, when the door was not immediately opened, appellant kicked on the door. The motorman opened it and appellant and deceased were admitted. Appellant stood by the fare box and mumbled, but did not pay fare. He wore dark trousers. The couple found seats on the car, while between Laclede and Chouteau. They left the street car at Grand and Arsenal, about 11:15 p.m.

Appellant and deceased appeared at Brownie's Tap Room, on Arsenal avenue, 3 doors east of Grand avenue, between 11 and 11:30 p.m. and stayed 15 to 20 minutes, only long enough to drink one bottle of beer each.

Some time before midnight, a couple meeting the same general description was observed standing by a lamppost at the southeast corner of Arsenal and Spring avenues, one block west of Grand avenue and some four minutes walking time from Brownie's Tap Room. Two or three minutes later the two walked across to the north side of Arsenal avenue, where they stood talking for about 5 minutes. After the man had moved to enter the park two or three times, he took the woman by the arm and they entered the park. It was then 11:45 to 11:55 p.m. Deceased had formerly lived in the vicinity of Spring and Arsenal.

After the couple had entered the park some 28 feet the man was seen to stop, stoop down and straighten up and adjust his pants and, subsequently (his white shirt) was seen moving slowly in the direction of where deceased's body was found. The woman, when last seen, appeared to be crawling in the same direction. The couple was already in the park before a police car arrived at the corner house, Spring and Arsenal, about 12 p.m. It stayed about 5 minutes and left. No outcry was heard from the park. One witness said that appellant's description was the same as the man she saw enter the park, but she could not identify appellant as the man. She said the woman was about 5 feet 5 inches in height and wore a shining black dress. She could not see whether the woman wore or carried a hat. The man had dark hair, his shirt sleeves were rolled up and he wore light pants or "olive drab." He was 2 to 5 inches taller than the woman. Another witness said that when he saw appellant on June 14, 1948, appellant looked just like the man that went into the park. Appellant's "general build" was identical to the man that went into the park. The man was stoop shouldered, slouched, with extremely long arms and his hands hung close to his knees. "His hair was mussed up and was shaggy and appeared long." He was taller than the woman. At the police station, appellant appeared to be the man who went into the park, he was of the same size and walked approximately the same way. His hair was the same color, but appeared to have been cut. The woman wore a shiny black dress. She had a large hat under her arm. He couldn't see any purse. The witness viewed the body of deceased after it was found and said (by the clothing) it appeared to have been the woman who entered the park.

The first positive identification of appellant after he left Brownie's Tap Room on the evening of June 11, 1948, was when he was observed, alone, coming from between some bushes on the south side of Tower Grove park, at a point where there was no path, between Oak Hill and Bent avenue, and opposite 4126 Arsenal avenue. He came into Arsenal avenue about half way, paused and looked in either direction, and then moved across to the sidewalk on the south side of the street, where he stood for just a few seconds, then moved over to a lightpost

and acted like he was going between two of the houses. He then turned and went west on Arsenal toward Bent avenue.

The witness observed appellant with his white shirt open at the neck and sleeves rolled about half way. He kept his head down most of the time. His shoulders were drooped. He had long dangling arms, a long face and pointed chin, his weight was 150 to 160 pounds, he was young for his size and had large ears and a large nose. Appellant came out of the park between 11:30 and 12 o'clock p.m. or it could have been a little bit after or a little bit before. It could have been a little after 12, because neither the witness nor her husband had a watch and they didn't look at the clock when they went in the house. It could have been 10 minutes after 12. It was around 12 o'clock. The witness had gone to her front porch at about 11 p.m., her husband joined her about 11:15 to 11:20, and they had been on the porch 45 to 50 minutes. Appellant at that time appeared to be wearing light colored, light weight pants. They looked to be light tan. The husband, also a witness, fixed the time "between a quarter to and a quarter after," nearer 12 p.m. The man's hair was heavy, disorderly and thrown back over his head. His arms appeared to be unusually long. He resembled appellant very much and witness thought appellant was the man.

On June 11 and 12 appellant resided at 5129a Vernon avenue, which is 1100 north, while Arsenal is 3100 south. Grand avenue is 3600 west and Kingshighway boulevard is 5000 west. Appellant's landlady testified that appellant phoned her around 8:30 p.m., June 11, 1948, and told her "he was on his way home, he was in the dentist's office and was on his way home." ▆ He arrived home, she would "judge it was between a quarter of twelve and 12:30" a.m., June 12. It could have been 12:18 or 12:30, she couldn't tell exactly. By street car and bus transportation available to appellant, he could have traveled from Oak Hill and Arsenal to his home in a minimum of 29 minutes, or with a maximum wait between schedules in 54 minutes, if he walked to Kingshighway, took a bus and then walked from Kingshighway to his home. There was no evidence that he used the public transportation system, that he walked beyond Bent avenue, nor was there evidence as to what method or means of travel was used in reaching his home.

One pair of blue trousers found in appellant's home showed a blood stain, roughly the diameter of a dime. It was identified as human blood belonging to classification AB with M factor present. About 5% of the people of European descent have type AB, or 42,500 out of 850,000 people in St. Louis in 1940. From the dry blood stain, the presence of other factors such as N and the subgroups could not be determined. From a sample of liquid blood, deceased's blood type was determined to be A sub one, B-MN. Her blood also showed 15%

116

alcohol present, indicating she was too intoxicated for safe driving. The blood type of appellant or his wife and children was not shown.

Appellant was arrested about 7:45 a.m., Monday, June 14, 1948. When questioned by the police appellant stated that, after work on June 11, he had entered the tavern at 213 Lucas, about 5:10 p.m. He bought deceased (a waitress, known as "Tubby"), several bottles of beer. They drank 7 or 8 bottles each. He became intoxicated and didn't remember anything after leaving the tavern until he woke up Saturday morning at home. He said he had had a blackout and had had mental blackouts several times before. He also stated: "I would sooner die in the gas chamber than have the true facts to be known. * * *. It looks like my goose is cooked * * *. I have no alibi or witnesses." He didn't deny and would not admit the murder, but said he didn't know. He viewed the body of deceased and said he could not recognize the deceased as the woman he was drinking beer with at the cafe. There were no bruises or lacerations on his body. He said that on Friday night, June 11, 1948, he had made a phone call from the tavern at 213 Lucas avenue to his landlady to notify his wife that he was going to the dentist and would be late coming home. He said he could or could not have been in the vicinity of Grand and Arsenal around 11 p.m., June 11, 1948. He didn't know what time he got home or what route he took home, or whether it was night or day "when he got in." When identified as having been a passenger on the Page avenue bus, the witness said to appellant "You had your hair cut" and appellant said, "Yes, I did." The witness then said that appellant looked like he hadn't had a hair cut for a couple of months, and appellant answered that it was only six weeks, and he had a hair cut around noon, Saturday, June 12.

While confined in the city jail, appellant said to a guard that the witnesses had only tracked him down as far as the park. He asked the guard if the circumstantial evidence was enough to convict him. When the witness asked about blood on appellant's shirt, appellant said the police hadn't found the shirt and wouldn't find it. A white shirt had been found hanging on a closet door in appellant's home, but, according to a witness at the trial, it wasn't the shirt appellant wore on the evening of June 11, 1948. Appellant also told the guard, "My wife can send me up for life." He further said he had been drinking beer with Gus, Bill and Charlie and along with the woman that was found murdered.

The foregoing is merely a sketch of the evidence contained in the voluminous record. Appellant did not testify at the trial and offered no evidence in his behalf.

Appellant assigns error on the trial court's refusal to give Instruction A, offered by defendant at the conclusion of the State's evidence, directing a verdict of "not guilty." Appellant contends that "the evidence offered by the State was purely circumstantial,

conflicting and insufficient to convict the defendant or to sustain a verdict of guilty." Appellant relies upon cases where the evidence was wholly circumstantial and was held insufficient. State v. Pritchett, 327 Mo. 1143, 39 S. W. (2d) 794; State v. Richardson (Mo. Sup.), 36 S. W. (2d) 944; State v. Buckley, 309 Mo. 38, 274 S. W. 74; State v. Ruckman, 253 Mo. 487, 161 S. W. 705. Appellant has taken a view of the evidence favorable to himself and unfavorable to the State. For example, appellant insists that he could not have entered the park at 11:58 p.m., June 11, 1948, at Spring and Arsenal, committed the murder, left the park three blocks further west, walked to Kingshighway, caught a bus to Vernon avenue, walked to his home and have arrived at his home at 12:18 a.m., June 12. However, in ruling the issue presented we are required to view the whole evidence in a light most favorable to the State. State v. Murphy, 356 Mo. 110, 201 S. W. (2d) 280; State v. Courtney, 356 Mo. 531, 202 S. W. (2d) 72. Considering the evidence most favorable to the State, appellant could have entered the park before 11:45 p.m., June 11, and could have arrived at his home after 12:30 a.m., June 12. The State's evidence didn't show that appellant walked to Kingshighway, that he rode a bus to Vernon avenue, or that he walked from there to his home, only that he reached his home about 12:15 to 12:30 a.m., the witness could not tell exactly. No witness attempted to fix the exact time that appellant entered or left the park or arrived at his home.

Appellant further contends the State's case is not aided by the evidence of motive, towit, a desire to have sexual relations with the deceased, because it is difficult to believe it would have been necessary to murder a woman of the apparent character of deceased "in an attempt to have intercourse with her." Again, appellant fails to accord to the State the right to a most favorable view of the evidence. Appellant also points to the fact that no outcry was heard from the park as conclusive evidence that the murder was not committed prior to 12:30, June 12, when the witnesses left the porch near Arsenal and Spring. On the other hand, an inference could be drawn that deceased was choked to death and that no outcry was ever made. Appellant further points to the absence of scratches, cuts and bruises on his hands and body, to the fact that most of his clothes lacked evidentiary value and to the fact that the blood on his pants could have been his own or that of his wife, children, or some other person than the deceased. Appellant points to the conflict in the testimony as to the color of his pants even by the witnesses who knew him, to the conflicts in the testimony as to the time and circumstances of the trip south on the Grand avenue street car and to the conflicts as to whether appellant and the deceased were sober or drunk during the various stages of the trip from Fred's cafe to Tower Grove park. These matters are not decisive, since the credibility, weight and value of each witness's testimony was for the jury and the reconciliation of the inconsistencies

118

between the testimony of the various witnesses was for the jury. Testing the sufficiency of the evidence, when viewed in the light most favorable to the State, means that we must resolve all conflicting evidence in favor of the State and consider as true all the evidence which is favorable to the State's case. State v. Rash, 359 Mo. 215, 221, S. W. (2d) 124, 126.

Where the evidence is "entirely circumstantial the facts and circumstances relied upon by the State to establish guilt must not only be consistent with each other and with the hypothesis of defendant's guilt, but they must also be inconsistent and irreconcilable with his innocence, and must point so clearly and satisfactorily to guilt as to exclude every reasonable hypothesis of innocence." State v. Murphy, 356 Mo. 110, 201 S. W. (2d) 280, 282; State v. Pritchett, supra, 39 S. W. (2d) 794; State v. Taylor, 347 Mo. 607, 148 S. W. (2d) 802, 805; State v. Battles, 357 Mo. 1223, 212 S. W. (2d) 753, 756. We will assume without deciding that the State's evidence is entirely circumstantial, although there is evidence in the nature of admissions by the defendant, which evidence might be considered as in the nature of direct evidence of the facts stated. State v. Huff, ▮ 353 Mo. 791, 184 S. W. (2d) 447, 451; State v. Criger (Mo. Sup.), 46 S. W. (2d) 537, 539. If the State's substantial testimony tending to implicate accused, when taken as true and considered with the legitimate inferences which may reasonably be indulged therefrom, supports the verdict of the jury, it must stand. State v. Allen, 342 Mo. 1043, 119 S. W. (2d) 304, 307; State v. Henke, 313 Mo. 615, 285 S. W. 392, 395; State v. Smith, 329 Mo. 272, 44 S. W. (2d) 45, 49.

The evidence was clearly sufficient to sustain a finding that appellant accompanied the deceased from Fred's Cafe into Tower Grove park and entered the park with her at the intersection of Spring and Arsenal avenue before 12 p.m., June 11, 1948; that they were last seen together within some fifty feet of where the deceased's body was subsequently discovered; that within a few minutes thereafter the appellant emerged alone from the park at a point not used by pedestrians and within three blocks of where he had been seen to enter the park with the deceased; and that deceased's purse and wallet were subsequently found in the immediate vicinity of the course taken by appellant in leaving the park. The more difficult question is whether or not appellant was responsible for deceased's death before parting from her at the place her body was found, but considering all of the facts and circumstances shown in evidence, including the evidence from which motive might be inferred, the shown condition and conduct of the parties, the evidence from which the time and place of death could be inferred and the statements and admissions of the appellant after his arrest, we think the evidence was entirely sufficient to make a submissible case and to sustain the verdict of the jury on the theory that the facts and circumstances in evidence exclude any reasonable

théory of the defendant's innocence, form a complete chain, are consistent with each other and point to the guilt of appellant. State v. Smith, supra, 44 S. W. (2d) 45, 48(4); State v. Taylor, supra, 148 S. W. (2d) 802.; State v. Concelia, 250 Mo. 411, 420, 425, 157 S. W. 788.

■ Appellant assigns error on the giving of Instruction 1, the State's principal instruction, and particularly the third subdivision thereof submitting the grounds for a finding of murder in the second degree. The reasons assigned are that "it (1) assumed, to the prejudice of appellant, that the beating and wounding of the deceased occurred on the 11th day of June, 1948, when under the evidence, the jury could have found that the assault on deceased occurred as late as 6 a.m. on the 12th day of June, 1948, at which time appellant was at home, or enroute to his home, and could not have committed the said assault; (2) required the unnecessary finding that the deceased 'then and there did languish, and languishing, did live from the said 11th day of June, 1948, 'til the 12th of June, 1948,' which prejudicially served to point out to the jury that the deceased had not died instantly, but had languished and suffered a slow and painful death; and (3) singled out, and gave undue prominence to the dates of June 11th and 12th, 1948, and to the evidence that deceased had languished, and languishing did live from the 11th day of June, 1948 to the 12th day of June, 1948, on which date she died and thus amounted to prejudicial comment on the evidence."

The second subdivision of said instruction submitting the issue of murder in the first degree submitted a finding that the assault was made "on the 11th day of June, 1948", giving the deceased a mortal wound of which wound deceased, on June 12, 1948, "at the said City of St. Louis, did die".

The third part of the instruction submitting the issue of murder in the second degree submitted a finding that, if "at any time prior to the filing of the indictment herein", the defendant feloniously, et cetera, did hit, strike and beat the deceased, "and if you further find and believe from the evidence that said Gladys Taylor Hallenbach Crossley *then and there did languish and languishing did live from the said 11th day of June, 1948, till the 12th day of June, 1948, on which said 12th day of June, 1948 the said Gladys Taylor Hallenbach Crossley* died from the effects of ■ such hitting, striking, beating and wounding, if you so find, then you will find the defendant guilty of Murder in the Second Degree; * * *" (Italics ours). The italicized words are identical in both subdivisions of the instruction.

Appellant relies upon two well established general rules, towit, (1) that "an instruction in a criminal case, which assumes a controverted fact, is erroneous"; and (2) that "an instruction which singles out evidence which is unfavorable to the defendant in a criminal cause

by calling the jury's attention thereto, and by giving it undue prominence, is erroneous.''

The issue presented is whether Instruction 1 violates either of these rules. In our opinion it does not. There was evidence from which the jury could have found that the assault occurred prior to midnight of June 11, 1948, that defendant left the park before midnight; and that death occurred after midnight and prior to 6 a.m., on the 12th. Clearly the instruction requires a finding of the matters mentioned and does not assume their truth. State v. Hannon, 356 Mo. 1058, 204 S. W. (2d) 915, 918; State v. Battles, supra, 212 S. W. (2d) 753, 758; State v. Jones (Mo. Sup.), 227 S. W. (2d) 713, 718; State v. Kauffman, 335 Mo. 611, 73 S. W. (2d) 217, 221. The jury had to so find to convict the defendant of murder in the second degree. Nor does the instruction single out and give undue prominence to ''evidence which is unfavorable to the defendant, or a comment on any evidence.'' It submits the ultimate fact and was supported by evidence. State v. Battles, supra; State v. Galliton, 176 Mo. App. 115, 122, 161 S. W. 848. As stated, the italicized words, supra, appear in subdivisions 2 and 3 of the same instruction. If the required finding ''did languish and languishing did live from the said 11th day of June, 1948, till the 12th day of June, 1948;'' was unnecessary to the submission of the second subdivision of the instruction, it only, we believe, imposed an unnecessary burden upon the State, without prejudice to the defendant, since the same finding as to this matter was properly submitted in subdivision two of the instruction. State v. Sillyman (Mo. Sup.), 7 S. W. (2d) 256, 258. The instruction conformed to the State's theory of the case.

Appellant further assigns error on the misconduct of the jury to the alleged prejudice of appellant, towit: (1) on the separation of the members of the jury from time to time during the progress of the trial and after the submission of the cause; (2) on their use of the telephone and on their receipt of unauthorized communications; and (3) on their receipt of uninspected bundles and grips, all without the knowledge or consent of the court or of appellant and his counsel.

The motion for a new trial contains similar general assignments and specifically refers to two such alleged separations when one juror became ill and to an occasion when six members of the jury entered the courtroom and were seated in advance of the others. An affidavit with reference thereto was attached to the motion. The trial court heard evidence in opposition to and in support of the specification in the motion for a new trial and affidavits of each of the jurors were received and filed in support of their verdict. This testimony and these affidavits cover some 240 pages of the transcription of the record. Appellant's review of this evidence covers more than six typewritten pages of his brief. There were some conflicts in the testimony and some evidence from which different inferences and conclusions could

be drawn. The trial court heard the testimony and, we believe, took a view of the evidence most favorable to the State, since he overruled the motion for a new trial.

As to the separation of the jury: On two occasions during the progress of the trial a juror became ill and was assisted to a room some eight feet from the courtroom door. There he was examined and treated by a physician. After he was assisted from the jury box, the other jurors went into a hall in front of the open door of the room where the ill juror rested for 15 to 20 minutes. All jurors remained under the control and immediate supervision of the sheriff and his deputies and the case was not discussed.

After the jury was sworn and as the jury returned from dinner at a hotel on Fifteenth street, one juror accompanied by one of the deputy sheriffs separated from the other jurors and moved his automobile from Fifteenth and Market to a location in front of the Municipal Courts building.

The cause was tried on the third floor of the Municipal Courts building. In taking the jury in and out of the building and from the courtroom on the third floor to the jury room on the second floor, a small automatic or self-service elevator opening into a narrow hall back of the courtroom was used. This elevator would not carry fourteen persons, so a deputy sheriff and six jurors would go into the elevator at one time and move to the proper floor and the elevator would then automatically be recalled and the other six jurors and a deputy sheriff would follow the first group. However, the return button on the second floor was out of order and the cage could not be returned to that floor without an operator, so a deputy sheriff would go up with six jurors, leave them in the narrow corridor, and go back for the other six and the other deputy sheriff. The same procedure was used in taking the jurors from the jury room to the basement and out to meals. There the first six were left in the basement hall by a basement door while the elevator was taken back for the other six and the other deputy sheriff. The basement door was locked after 5 p.m., but the deputies had keys. The first six jurors would be out of sight of the deputies for about a minute, only long enough to go get the other jurors and deputy sheriff. This latter procedure was only used when leaving the second floor, but it was used before and after submission of the cause to the jury. The sheriff and his other deputies attending the trial on the third floor were usually on hand to receive the first six jurors brought up to the third floor. The outside door in the basement hall was usually locked. There was no evidence that in the use of his procedure the jurors at any time actually came into contact with any unauthorized persons on either floor, although it would have been possible, since a member of the public could have been in either hall. There was evidence that on two occasions the first six jurors were left unattended by any one on the third floor

122

pending the arrival of the second six jurors; and that on one occasion six jurors entered the courtroom 60 feet from the elevator and were seated ahead of the other six. These occasions were prior to the submission of the cause.

During the night, following the submission of the case to the jury, ten of the jurors slept in one room, while two of them and a deputy sheriff slept in a separate and distinct room, the other deputy sleeping in still another separate and distinct room. It is not entirely clear from the transcript, but apparently all of these rooms were in the jury compartment of the Municipal Courts Building and, as we read the record, although ten of the jurors were in a separate and distinct room from the other two, there was no door or method of closing the opening between the rooms.

Other alleged separations, include (1) occasions during the trial when one deputy sheriff took two jurors from a table in the hotel dining room, where all jurors were seated, to telephones in the lobby 20 feet outside the dining room door and not in view of the other jurors; and (2) an occasion *after* submission when a deputy and two jurors separated from the other jurors and deputy sheriff some 60 feet in the open hotel lobby to purchase cigars and cigarettes.

The separation of the jury in the trial of a capital case, except as provided by statute, is prohibited. Secs. 546.230 and 546.240 RS Mo 1949; State v. Gray, 100 Mo. 523, 13 S. W. 806; State v. Schlie, 350 Mo. 924, 169 S. W. (2d) 348. Separation of the jury without leave of the court is a ground for new trial. Sec. 547.020 RS Mo 1949. In construing these sections this court has held that, where the separations have taken place *before* submission, the burden rests upon the State to affirmatively show that the jurors were not subjected to improper influences during the separations to the prejudice of the defendant, while, if the separation occurred *after* submission, a new trial is required regardless of any actual misconduct of the jury to the prejudice of the defendant. State v. Dodson, 338 Mo. 846, 92 S. W. (2d) 614, 615; State v. Shawley, 334 Mo. 352, 67 S. W. (2d) 74, 88; State v. Schlie, supra, 169 S. W. (2d) 348; State v. Tarwater, 293 Mo. 273, 239 S. W. 480, 485; State v. Hayes, 323 Mo. 578, 19 S. W. (2d) 883, 885. The first essential question presented here is whether or not any of the alleged separations relied upon as having occurred *after* the submission of the cause were separations within the meaning of the statutes, supra, as determined by the prior decisions of this court. The instances relied upon concern separations in the use of the elevator, in the sleeping arrangements and in the purchase of cigarettes in the hotel lobby. This court has held that the issue of separation must be determined by some reasonable rule. State v. Shawley, supra, 67 S. W. (2d) 74, 88; State v. McGee, 336 Mo. 1082, 83 S. W. (2d) 98, 103-104. "A sensible and substantial compliance * * * must be considered sufficient." State v. Ferguson (Mo. Sup.), 133 S.

W. (2d) 1023, 1025. We think there was no such separation of the jury after submission as falls within the prohibition of the statutes. State v. Shawley, supra; State v. McGee, supra; State v. Martin, 349 Mo. 639, 162 S. W. (2d) 847, 852; State v. Arnett, 338 Mo. 907, 92 S. W. (2d) 897, 903; State v. Link, 318 Mo. 1179, 3 S. W. (2d) 369, 371; State v. Ferguson, supra; State v. Spaugh, 200 Mo. 571, 608, 98 S. W. 55. In each instance relied upon the jurors were still under the control and supervision of the officers in charge, although not subject to ocular surveillance at all times. State v. Shawley, supra; 67 S. W. (2d) 74, 88; State v. Arnett, supra, 92 S. W. (2d) 897, 903.

On the issue of separation *before* submission of the cause, appellant relies upon the alleged separation of the jury in the movement of the juror's automobile, on the two occasions when the juror became ill, on all occasions when the jurors were moved by use of the small elevator and on all the occasions when any jurors, accompanied by a deputy sheriff, left the others in the hotel dining room to use the telephones in the lobby. If we assume without deciding that all of these alleged separations, except in the use of the elevator, were in fact separations within the meaning of the statutes, the only issue presented on this appeal is whether the State affirmatively sustained the burden of proof resting upon it to show that the jurors were not subjected to improper influences by such separations, or at any time during the physical separations resulting from the use of the small elevator. State v. Schlie, supra. We think the evidence heard by the court on this issue was entirely sufficient to sustain the court's ruling. The mere possibility that something prejudicial could have happened, of which there is no proof, is insufficient to require a new trial, where such possibility is rebutted by other facts and circumstances. State v. Ferguson, supra, 133 S. W. (2d) 1023, 1025. With nothing in the record indicating that appellant was prejudiced or that the jury was subjected to any improper influences, we think the evidence heard by the court and the affidavits received in evidence were sufficient to show that no improper influences were exerted on the jury and that appellant was not prejudiced. State v. Boone, 355 Mo. 550, 196 S. W. (2d) 794, 797; State v. Tarwater, supra; State v. Westmoreland (Mo. Sup.), 126 S. W. (2d) 202, 204; State v. King, 342 Mo. 1067, 119 S. W. (2d) 322, 328; State v. Nenninger, 354 Mo. 53, 188 S. W. (2d) 56, 59. Some measure of discretion must be confided to the trial court as he heard the evidence and ruled the issues presented. No abuse of that discretion appears. State v. Shawley, supra, 67 S. W. (2d) 74, 88; State v. Bailey, 344 Mo. 322, 126 S. W. (2d) 224, 227. Only in a clear case should this court disturb such a ruling of the trial court. State v. McGee, supra, 83 S. W. (2d) 98, 104(7).

There remains for consideration the evidence concerning the jurors' unauthorized use of the telephone on many occasions during

the course of the trial and concerning their receipt of unauthorized communications and uninspected packages. Jurors, used the telephone to ask about the welfare of their families, to advise that they would not return home at certain times and to ask for clean clothing. One or two deputy sheriffs were present when each call was made and the conversations of the jurors were heard, but who was called, or what was said to the jurors was unknown to the deputy sheriffs. The jurors were told that nothing should be said about the case. None of the calls were of an emergency nature. In none of the communications was the cause on trial mentioned or discussed. Bundles and grips, which were assumed to contain only clean clothing, were received by the jurors. These bundles and grips were left with the building night watchman and by him delivered to the deputy sheriffs who made delivery to the jurors without inspection.

It is well settled that jurors should not be allowed to use the telephone during the trial of a criminal case, or to receive communications except by direction and under the supervision of the court. State v. Malone, 333 Mo. 594, 62 S. W. (2d) 909, 913(8); State v. Gilmore, 336 Mo. 784, 81 S. W. (2d) 431, 433; State v. McGee, supra, 83 S. W. (2d) 98, 104; State v. Shawley, supra, 67 S. W. (2d) 74, 90. The officer in charge should not communicate with them unless by order of the court. State v. Hayes, supra, 19 S. W. (2d) 883, 887. And the jury should not be allowed to receive uninspected bundles and grips. State v. Shawley, supra, 67 S. W. (2d) 74, 90. Without reviewing the evidence presented before the trial judge to sustain the State's burden to show the absence of improper influences and to disprove prejudice to appellant by reason of the improprieties shown by this record, and without in the least condoning the unlawful and dangerous practices disclosed, we think the record fully sustains the court's finding that the jurors were not subjected to improper influences and that appellant was not in fact prejudiced by the improprieties admitted. State v. Shawley, supra; State v. McGee, supra.

We have examined the entire record and find no reversible error. Appellant had a fair trial. He was ably represented in the trial and on appeal. The judgment is affirmed. All concur.